17351

NINA MAE BENTON, AN INFANT, BY HER GUARDIAN *AD LITEM*, LEWIS BENTON, Respondent, v. J. B. PELLUM, Appellant

(100 S. E. (2d) 534)

*Messrs. Hope & Cabaniss,* of Charleston, and *Bogoslow & Howell,* of Walterboro, *for Appellant,*

*Messrs. Smoak & Smoak,* of Walterboro, *for Respondent,*

November 13, 1957.

OXNER, Justice.

Respondent brought this action to recover damages for personal injuries sustained while riding as a guest in an automobile driven by appellant. The trial resulted in a verdict in favor of respondent for $4,500.00 actual damages and $4,500.00 punitive damages. The Court granted a new trial unless respondent remitted on the record $2,000.00 of the verdict for punitive damages. This was done and judgment entered for $7,000.00.

The first question is whether the Court below erred in refusing a motion for a directed verdict upon the ground that there was no evidence of actionable recklessness or wantonness on the part of appellant. Section 46-801 of the 1952 Code, as construed by this Court, restricts liability to a guest to cases where the injury has resulted from either intentional or reckless misconduct on the part of the owner or operator. *Fulghum v. Bleakley*, 177 S. C. 286, 181 S. E. 30. There is no claim in the instant case of intentional misconduct on the part of appellant. Hence our inquiry is whether or not there is any evidence reasonably sustaining an inference of actionable recklessess.

About 11:00 P. M. on December 24, 1954, at a point on Highway No. 63 approximately three miles west of Walterboro, South Carolina, a 1952 Ford automobile driven by appellant struck the right side of a 1946 Buick which, according to respondent, was stalled in the highway. Respondent and four or five others were injured. One of the passengers in the Buick was killed.

On the front seat of the Ford with appellant were his sister and a nephew. Respondent, then fifteen years of age, was riding on the rear seat with another nephew of appellant. Earlier in the evening these young people had gone to a skating rink at Scotia in Hampton County and at the time of the accident were returning to Walterboro. Appellant's sister testified that on this return trip he drove at an excessive rate of speed and on one occasion when driving about 70 miles an hour, she "had to call him down."

Highway No. 63 is paved. On either side there are shoulders wide enough for a car to be driven entirely off the road. Appellant was traveling in an easterly direction. The road, with which he was thorougly familiar, was level and the night was clear. As appellant approached the place of the collision there was a very slight curve to the left and on the northern side of the highway there was a combination store and filling station which was well lighted. On the night of the accident they were having a barbecue at this place and there were a number of cars parked around it.

Respondent was asleep at the time of the collision. The testimony of her witnesses may be briefly summarized as follows: The driver of the Buick with which appellant collided, after attending the barbecue with his wife and several friends, entered Highway No. 63 with the intention of making a left turn and driving in an easterly direction. His lights were on and there were no cars approaching. When in about the middle of the highway before making his left turn, the car then being at about a ninety-degree angle facing the southern shoulder, he choked down. He was unsuccessful in his efforts to start the engine. After being in this position

for about a minute or a minute and a half, appellant was seen approaching three or four hundred yards away, traveling at a speed variously estimated at from 75 to 100 miles an hour. He did not slow down or make any effort to avoid striking the Buick until just before the accident. The front of his car struck the Buick between the two right doors making an indentation of about a foot and a half and knocking or pushing the Buick sideways down the highway a distance of 55 feet. Both cars were practically demolished. An examination after the accident revealed brake marks on the pavement extending a distance of nine feet before the impact.

Appellant testified that as he approached the place of the accident, traveling at a speed of 40 or 50 miles an hour, he was blinded by the bright lights of a car parked at the store. He dimmed his lights and when he turned his bright lights back on, he saw the Buick automobile across the highway in his lane of traffic. He was not sure whether the Buick, which he said had no lights on, was stopped or moving but thought it was moving. He says he immediately applied his brakes but was unable to avoid the collision. His nephew, who was sitting on the rear seat with respondent, testified that when appellant "hit the brakes and the tires began squealing", he looked up and saw the Buick, without lights, across the road in front of them. He was of the opinion that the Buick entered the highway from the filling station and was 40 or 50 feet away "when it started across the road in front of us." The other nephew, who was sitting on the front seat with appellant, was quite positive that when they approached the place of the accident, appellant was not driving faster than 40 or 50 miles an hour.

Considering this conflicting testimony in the light most favorable to respondent, as must be done in passing on a motion for a directed verdict, we think the jury could reasonably infer that appellant was reckless in failing to keep a proper lookout, in failing to have his car under control, and in driving at an excessive rate of speed, and further that such recklessness was a proximate cause of

the collision. Not to be overlooked is the well-settled principle that negligence or recklessness, to render a person liable, need not be the sole cause of an injury. It is sufficient to show that it is a proximate concurring cause. *Huggins v. Atlantic Coast Line Railway Co.,* 158 S. C. 501, 155 S. E. 839; *Landreth v. Atlantic Refining Co.,* 177 S. C. 490, 181 S. E. 727; *Horne v. Southern Railway Co.,* 186 S. C. 525, 197 S. E. 31, 116 A. L. R. 745; *Culbertson v. Johnson Motor Lines, Inc.,* 226 S. C. 13, 83 S. E. (2d) 338.

The refusal of the motion for a directed verdict is fully sustained, among others, by the following decisions: *Peak v. Fripp,* 195 S. C. 324, 11 S. E. (2d) 383; *Brown v. Hill,* 228 S. C. 34, 88 S. E. (2d) 838; *Saxon v. Saxon,* S. C., 98 S. E. (2d) 803.

The next question is whether the Court erred in excluding the result of a blood analysis made by the Medical College of South Carolina, offered by appellant for the purpose of showing that one Hampie Hudson, the driver of the Buick, was highly intoxicated at the time of the collision. The trial Judge concluded that the proper foundation had not been laid for the admission of this report.

It appears that after the accident Hudson and appellant were taken to the Colleton County Hospital at Walterboro, where about 12:30 A. M. on December 25th the technologist drew a blood sample from both of these men. He testified that each sample was placed in a vial labeled with the name of the person whose blood was taken, and that these bottles, along with a request that an alcohol determination be made, were wrapped for mailing to the Medical College at Charleston. He said, as was customary, he placed the package on the desk of the Superintendent of the Hospital but had no personal knowledge as to how it was thereafter handled. According to his testimony, the usual practice is to mail the specimens to the Medical College or send them by a highway patrolman.

The Superintendent of the Hospital testified that he usually reached his office about nine o'clock in the morning; that

they have an employee who picks up the mail on his desk but that since it was Christmas Day this employee was probably off duty and very likely he, himself, handled the mail that day. However, he said he had no personal knowledge of having mailed the package containing these blood samples.

The chemist at the Medical College in charge of running blood tests testified that specimens to be analyzed are put on his desk by his secretary who gets his mail; that on Monday, December 27th, he found on his desk a package containing two samples bearing the names of appellant and Hampie Hudson; that he unwrapped the package and alcohol tests were run on both specimens under his supervision; that the test on Hampie Hudson showed ".266 miligrams per cent of alcohol"; and that a person having this much alcohol in his blood would be highly intoxicated. He conceded that the only way he knew whose blood was being tested was from the label on the bottle. His testimony is silent as to how this particular package was wrapped or whether there was any postmark on it.

The problem of showing that the specimen analyzed actually was taken from the subject person is frequently a difficult one, for ordinarily the specimen is passed through several hands before being analyzed and it is not possible to establish identity by a single witness. Many cases on the subject will be found in an annotation in 21 A. L. R. (2d), beginning on page 1216. While proof need not negative all possibility of tampering, *People v. Riser*, 47 Cal. (2d) 566, 305 P. (2d) 1, it is generally held that the party offering such specimen is required to establish, at least as far as practicable, a complete chain of evidence, tracing possession from the time the specimen is taken from the human body to the final custodian by whom it is analyzed. *Joyner v. Utterback,* 196 Iowa 1040, 195 N. W. 594. As stated in *Rodgers v. Commonwealth,* 197 Va. 527, 90 S. E. (2d) 257, 260, "Where the substance analyzed has passed through several hands the evidence must not leave it to

conjecture as to who had it and what was done with it between the taking and the analysis."

We do not think the proof here is sufficient to show continuity in the chain of custody. There is no evidence that the technologist who drew the samples sealed the vials or otherwise took any precautions against tampering. He wrapped them and placed the package on the desk of the superintendent. Just how long it remained there or by whom removed, we do not know. Neither is it definitely shown that the package was mailed at Walterboro. It is true that several of the witnesses referred to its being mailed but this was necessarily either a mere conclusion based on hearsay or an inference from the customary method of handling these specimens. The record does not disclose who had possession of the package from the early morning of December 25th until the chemist at the Medical College opened it on December 27th. There is no testimony by whom the package was received at the Medical College. This missing link could have probably been supplied by the chemist's secretary who was not offered as a witness. There was no effort at the trial to produce the vials, the labels, or the request for a blood analysis so as to determine whether or not the technologist could identify them as those he wrapped for mailing.

The following cases support the exclusion of this testimony: *Rodgers v. Commonwealth, supra,* 197 Va. 527, 90 S. E. (2d) 257; *Brown v. State,* 156 Tex. Cr. R. 144, 240 S. W. (2d) 310; *Nichols v. McCoy,* Cal. App., 235 P. (2d) 412; *Novak v. District of Columbia,* 82 U. S. App., D. C., 95, 160 F. (2d) 588; *People v. Sansalone,* 208 Misc. 491, 146 N. Y. S. (2d) 359.

We need not pass upon respondent's contention that in no event could the exclusion of this evidence have been prejudicial because any intoxication on the part of Hudson was immaterial.

The final exception is that the Court erred in refusing a motion "for a new trial absolute when the verdict was so excessive that it was clearly the result of caprice, passion or prejudice."

Immediately after the accident respondent was taken to the hospital at Walterboro where she remained for approximately one week. Later she was sent to the Medical College at Charleston for observation. She had formerly enjoyed excellent health and was an average student in school. From her testimony and that of several others it appears that since the accident she has suffered constant headaches and has had frequent blackouts. In fact, she had forty or fifty blackouts within one year after the accident. When she has such an attack she remains unconscious for a period of ten to fifty minutes. After the accident she tried to resume her school work but finally had to drop out for that year, thereby losing a grade. She is extremely nervous and is unable because of her headaches to concentrate on her school work, and is also frequently absent. The attending physician testified that she suffered "a contusion of the scalp and a severe sprain of the left ankle." It was his opinion that the blackouts "were due to a mild concussion sustained in the accident." He was unable to say how long they would continue.

We do not think that the size of this verdict is such as to indicate that the jury was actuated by passion, prejudice or other considerations not founded on the evidence.

Judgment affirmed.

STUKES, C. J., and TAYLOR, LEGGE and MOSS, JJ., concur.