No. 44,891

CECIL ATKINSON AND LOLITA ATKINSON, *Appellees*, v. THE HERINGTON CATTLE COMPANY, INC., a Corporation, and SWIFT & COMPANY, a Corporation, *Appellants*.

(436 P. 2d 816)

Opinion filed January 27, 1968.

*Charles S. Arthur*, of Manhattan, argued the cause, and *Charles D. Green*, of Manhattan, was with him on the briefs for the appellant, Herington Cattle Company, Inc.

*Elvin D. Perkins*, of Emporia, argued the cause, and *Everett E. Steerman*, and *Keith A. Greiner*, both of Emporia, were with him on the briefs for the appellant, Swift & Company.

*David H. Heilman*, of Council Grove, argued the cause and was on the briefs for the appellees.

The opinion of the court was delivered by

KAUL, J.: This is an action by plaintiffs-appellees for damages for pollution of their dairy farm water supply resulting from a cattle feeding operation of defendants-appellants. For convenience the appellees will be referred to hereafter as Atkinsons and the appellants as Herington and Swift.

In 1961 Herington leased a tract of land, formerly a part of the

Herington Air Base, from the City of Herington and constructed facilities for the commercial feeding of cattle. The cattle feeding operations were commenced in December of 1961. In the fall of 1962 Herington commenced feeding cattle for Swift and early in 1963 the Herington operation became exclusively feeding cattle for Swift. An agreement was entered into between Herington and Swift under which Herington agreed to feed and care for cattle (and calves) owned by Swift up to a maximum of 7500 head at any time.

Atkinsons owned and operated a 160 acre Grade A dairy farm located about one and one-half miles north and east of Herington's feed yards. A small stream identified as Level Creek is formed by headwaters near the Herington feedlots. The course of the stream is in a northeasterly direction and proceeds through the Atkinson farm in a northeasterly direction about 400 feet northwest of the improvements thereon.

Level Creek runs intermittently and in dry seasons consists only of pools. The runoff from rainfall on the Herington feedlots drains into Level Creek. The land lying between Herington and Atkinsons consists of pasture land and cattle are pastured thereon during the season. The drainage from Atkinsons' feedlot also runs into Level Creek, and Atkinsons' livestock have access to it and wade therein. Atkinsons' water supply consisted of Level Creek and a well near their farm improvements. The well was about 400 feet from and considerably higher than the stream bed of Level Creek. There was also an unused old dug well on the Atkinson property close to the bank of Level Creek. The mouth of the dug well was two or three feet higher than the base of Level Creek.

Atkinsons claim the waters of Level Creek became polluted on June 13, 1963, and as a result the water in their well also became polluted, unusable for human consumption, detrimental to livestock consumption, and unfit in their dairy operation, and has remained so since that date. Atkinsons claim the pollution was caused by Herington and Swift in the operation of their feedlots; that they refused to attempt to abate such pollution, and that as a result the source of water on Atkinsons' land was destroyed.

Atkinsons pleaded three causes of action in their petition. They alleged the concurrent action of both defendants polluted the water resources on their farm in their first cause of action and prayed

for injunctive relief. The first cause of action was dismissed prior to trial.

For their second cause of action, Atkinsons alleged the acts of defendants constituted a nuisance, a trespass, and gross and wanton negligence. Atkinsons claimed damages to their real estate resulting from the loss of water supply, damages for loss of and injury to livestock, and for incurred and future expenses in attempting to mitigate damages.

For their third cause of action, Atkinsons alleged the acts of defendants constituted gross and wanton negligence, a reckless disregard for the rights of others, and prayed for punitive damages.

The defendants denied that either of them caused or contributed to the pollution of a stream or source of water of Atkinsons, and Swift further specifically denied that it operated or controlled any feedlots in Morris County.

Issues were joined, and the cause was tried to the court without a jury. The trial was commenced on May 11 and continued through May 18, 1965. The evidence consisted of the testimony of 31 witnesses, many of whom were experts, and some 100 exhibits. The trial court found generally for Atkinsons and against Herington and Swift jointly and severally in the amounts of $21,560.53 actual and $7,500 punitive damages. The trial court filed extensive findings of fact and arrived at conclusions of law based thereon.

We believe a recitation of some findings of fact of the trial court will enable a better understanding of our discussion. Therefore, we quote pertinent portions as follows:

"5. The defendants, The Herington Cattle Company, Inc., and Swift & Company, a corporation, entered into a contract whereby Swift & Company provided the livestock and feed for the livestock and The Herington Cattle Company, Inc., was to provide feeding of the animals and provide the premises therefor and all other conditions as set forth in the contract.

"The contract that Swift & Company, had with The Herington Cattle Company, Inc., was so artfully and skillfully drawn that it reduced the status of The Herington Cattle Company, Inc., to that of a hired man, Swift & Company being in complete dominance of authority and control and in essence established a joint venture of the defendants.

"6. That The Herington Cattle Company, Inc., commenced extensive feedlot operations consisting of full feeding of livestock in small pens, and the feeding relationship with Swift & Company commenced in the fall of 1962.

"7. That The Herington Cattle Company, Inc., is now feeding livestock exclusively for Swift & Company, and the exclusive feeding of livestock for Swift & Company commenced early in 1963.

"8. That the feedlot operations conducted upon the property previously referred to herein drains exclusively into a stream known as Level Creek.

"9. That the pens and feedlot operations conducted by The Herington Cattle Company, Inc., and Swift & Company consist of pens, as follows:

"29 pens—200 feet wide by 215 to 265 feet long;

"12 pens—100 feet wide by 165 feet long;

"1 pen—120 feet wide by 165 feet long; and numerous holding and sorting pens."

In finding No. 10 the trial court enumerated the number of cattle in the Herington pens for each month, commencing with October 1962 and running through September 1964. The numbers vary from 554 in October 1962 and 839 in June 1965 to a high of over 7000 head in December 1963.

Further findings of the trial court are as follows:

"11. That the plaintiffs live and reside upon real estate previously described and are engaged in the business of general farming and have been operating a Grade A dairy, and have lived on the property since 1958.

"12. That the plaintiffs' property has a stream going through it which is known as Level Creek.

"13. That the first noticeable water contamination of Level Creek first flowed through the plaintiffs' property on or about June 13, 1963, as a result of moisture and rainfall, and at that time the water in Level Creek flowing through the plaintiffs' property had a very foul and strong odor of manure, and the water contained a color of yellow or brown. That this stream had at no time prior to this occasion ever had such an odor or color prior to the flowing of the stream on or about June 13, 1963.

"14. That the farm was improved for Grade A dairy purposes, consisting of a milking parlor with a water system, stanchions, heat, electricity, and water pressure; also a modern home, a large barn, silo, hog parlor, garage, granary, steel bin, chicken house, and calf shed.

"15. All of the drainage from the feedlot operations of The Herington Cattle Company, Inc., and Swift & Company flow into Level Creek, which is approximately one and one-quarter mile upstream from the plaintiffs' property. The feedlot drainage is near the beginning or head of Level Creek drainage.

"16. The well upon the plaintiffs' property was being used for the watering of livestock, their Grade A dairy operations, and also used for their own home use. Prior to June 13, 1963, the water had always been clear, and there had never been any odor of manure, or any other odor, in the water derived from the well upon their property.

"17. That the conditions existing concerning the conditions and pollution of the water in the well and Level Creek had been called to the attention of The Herington Cattle Company, Inc., on repeated and frequent occasions; however, such complaints were ignored.

18. The efforts made by The Herington Cattle Company, Inc., to correct the situation and to handle the drainage from the feedlots were practically nil to date regardless of the fact they were at all times fully aware of the com-

plaints and results of the various tests and the losses being sustained by the plaintiffs.

"19. The pollution in Level Creek and the well on plaintiffs' dairy farm was grossly excessive and caused by the feedlots operated by the defendants.

"20. Dr. Jernigan, a practicing veterinarian, in December of 1963 or January of 1964, after diagnosis and treatment of the livestock, recognized the symptoms as that of nitrate, resulting in the loss and death of the animals.

"21. There is ample testimony to substantiate the fact that the contamination of the water supply of plaintiffs was caused by the acts and conduct of the defendants and resulted in substantial damage and loss to plaintiffs.

"22. There was on occasions a variance of the tests; however, this does not lessen the damaging fact that the defendants contaminated the water supply, resulting in the abortions and deaths of plaintiffs' livestock.

"23. As a result of the acts and conduct of each of the defendants as hereinbefore set forth, the Court finds that the plaintiffs are entitled to punitive damages in the amount of $7,500.00.

"24. The plaintiffs have done everything reasonable, prudent and proper throughout the difficulty, to mitigate their damages while defendants have continuously ignored the problem since as long ago as 1961 and have to date of the trial only scratched the surface toward correction of the pollution of the water supply caused by their operations.

"25. The contract admitted in evidence and hereinbefore referred to between The Herington Cattle Company, Inc., and Swift & Company was not, within itself, exclusive to Swift & Company, but there is no evidence that anyone else had cattle on the premises other than Swift & Company after the contract."

## The trial court made conclusions of law as follows:

"1. A person or persons who have brought something onto property which is not naturally there, harmless to others so long as it is confined to their own property or premises, but which they know to be mischievous or dangerous if it gets on his neighbor's property is obligated to make good the damages which ensue if they do not succeed in confining it to their own property.

"2. Where two or more persons by their concurrent action pollute or contaminate a stream to the injury of another through whose land the stream flows, they are jointly and severally liable for the wrongdoing, and the injured party may, at his option institute an action and recover against one or all of those contributing to his injury.

"3. Proof that damage to real estate will exist for an indefinite time is ample to sustain a judgment for permanent damage.

"4. Negligence is not a necessary element of the right of recovery in the water pollution case. The right to recover results from the defendants having a harmful substance on their land and permitting it to escape to the damage of the plaintiffs.

"5. The contract and relationship between the defendant, The Herington Cattle Company, Inc., and the defendant, Swift & Company, reveals that both of the defendants are jointly and severally liable to the plaintiffs in the above-entitled case.

"6. Punitive damages are to be allowed where the defendants are aware

of and know that there has been a water pollution and contamination as the result of their business, or operations, or that they should have been aware of the water pollution; or if such acts are done intentionally, or that the defendants caused said damage and water pollution and were apparently indifferent to its consequences.

"7. All motions of the defendant, Swift & Company, for summary judgment are overruled."

Plaintiffs were awarded damages against Swift and Herington jointly and severally as follows:

| | |
|---|---|
| "Loss of Calves | $1,440.00 |
| "Loss of Cows (actually dead) | 2,695.00 |
| "Loss of Cows (required to be sold) | 1,994.87 |
| "Veterinary Expense | 96.00 |
| "Cost of Chlorinator | 189.00 |
| "Vitamin A (purchased for sick animals) | 145.66 |
| "Loss of Milk Production | 5,000.00 |
| "Damages to Real Property | 10,000.00 |
| "Punitive Damages | 7,500.00 |
| "Total Damages | $29,060.53." |

Swift and Herington each filed motions for a new trial which were argued and overruled. Thereafter this appeal was perfected.

On appeal Herington specified sixteen points of error and Swift thirteen. In general the points on appeal are directed at the specific findings of fact of the trial court which Swift and Herington claim are not sustained by the evidence. The issues raised on appeal may be grouped in three categories. First, is there evidence to sustain the trial court's findings that the pollution in Level Creek and plaintiffs' well was grossly excessive and caused by the feedlot operations of defendants? Second, was there evidence to sustain the award of damages? Third, are defendants, Swift and Herington, jointly and severally liable under the terms of the contract between them, as concluded by the trial court?

We shall first consider the trial court's findings as to pollution and its cause. The record, most of which has to do with these points, is voluminous. It consists of the testimony of 31 witnesses and approximately 100 exhibits. Many of the witnesses were experts; bacteriologists, chemists, geologists and other technicians.

According to Atkinsons the first appearance of visible pollution in Level Creek occurred after some heavy rains in June 1963. Official records of the State Weather Bureau of rainfall at White City (about seven miles from the Atkinson farm), the nearest reporting station, disclosed rainfall of 1.88 inches on June 12, 2.10 inches on

June 15, and 1.09 inches on June 16, 1963. Prior to this time, according to Atkinsons, the creek would be muddy after heavy rains but there would be no odor. After the June 1963 rains Atkinsons and other witnesses described the creek as having a high odor of manure and a deep yellow color. At about the same time Atkinsons noticed an odor of manure and a yellow color in their well water. Atkinsons notified their County Agricultural Agent, their veterinarian, the Shawnee Milk Producers Association, of which they were members, the Kansas State Board of Health and the State Board of Agriculture. Various representatives of these agencies inspected the premises in June, July and August of 1963. Samples were taken of water from the creek and well and laboratory tests were made. The tests disclosed that the well and creek were both contaminated with types of coliform bacteria. After sickness was detected among Atkinson's cattle, tests were made for nitrate content in the water.

Early in November 1963 Ronald Miner, a graduate student of Kansas State University, and previously a sanitary engineer for the State Board of Health, took five samples from Level Creek, the first taken from a drainage pond, immediately below the feedlots, and the other at four stations downstream. Bacteriological tests were made by the State Board of Health laboratories. The results were put in evidence and explained by Howard Stoltenberg, the chemist in charge of the chemistry division of the State Board of Health. Tests were made for dissolved oxygen, biochemical oxygen demand, ammonia as nitrogen, total coliform and fecal coliform. The results indicated severe pollution at three points upstream from Atkinsons.

Because of the Grade A dairy operations periodic tests for bacteria had previously been made of the Atkinson well. No high bacteria reports had been received prior to June 1963. William J. Rankin, manager of the Shawnee Milk Producers Association, examined samples of the well water in June 1963 and detected a color and odor. On July 31, 1963, Rankin, Dr. Hudelson, veterinarian for the State Livestock Sanitary Commissioner, and Ralph Bowman, then manager of Herington, inspected Level Creek and the runoff from the Herington feedlots. At this time a meeting with various state agencies was arranged and scheduled for August 31, 1963. Dean Strowig, district engineer for the State Board of Health, inspected the premises on July 15, 1963, and took samples

from the creek and well. He described the creek water as septic in condition with a high odor of ammonia. He also observed dead fish in the creek and other fish swimming lazily around. Various samples were taken from the well between June 24 and September 9, 1963. Laboratory tests showed a high coliform content. Virgil R. Layton, a milk sanitarian supervisor of the State Board of Agriculture, recommended the installation of a chlorinator on the well, and one was installed on October 3, 1963.

Some of Atkinsons' cows became ill in November 1963, and some cows and calves died. There was a loss in milk production and some cows were sold. It was the opinion of several veterinarians that the trouble stemmed from nitrate poisoning. Thereafter, in February 1964, the Atkinson well was tested for the presence of nitrates. The test showed nitrates in quantity of 80 parts per million. Numerous tests of the Atkinson well were taken thereafter and in most cases the results showed a dangerous content of nitrates. The experts were generally in agreement that maximum safe nitrate content is 45 to 50 parts per million. The experts also generally agreed that livestock manure and urine have a high nitrate content. There was variance between results of some of the tests for quantities of nitrates in parts per million and in the case of several samples taken by Atkinsons, the results showed nitrate content as high as 47,000 parts per million. Witnesses for defendants testified they had never heard of a concentration of more than 1000 parts per million and an increase in the creek concentration from 4.0 to 47,000 parts per million of nitrate during a two week period without rainfall was impossible. The inference left was that the samples taken by Atkinsons had either been fixed by the addition of liquid fertilizer to the water samples or the variance resulted from laboratory error.

There was also expert testimony that the presence of bacteria microorganisms can increase nitrate content from the original amount and that weather conditions have an effect on bacteria action. It was established that there are three different methods used in laboratory testing for nitrate. A laboratory technician called as a witness for defendants used the three methods in testing the same sample and found a variance from 35.2 to 167 parts per million which he was unable to explain.

Defendants posed the proposition that the nitrate contamination in the well could never be higher than that of its source. In other

words, since some tests showed that on the same day nitrate parts per million in the well were considerably higher than that shown by tests of creek water, the creek must be eliminated as a source of contamination of the well. On the other hand, several witnesses for plaintiffs testified positively the source of well contamination was the creek water.

The trial court took cognizance of the variance in some of the tests but found that such did not lessen the damaging fact that defendants contaminated plaintiffs' water supply. While there is some variance in test results it cannot be denied that there is ample evidence to support the finding that the waters of Level Creek and plaintiffs' well were contaminated with coliform bacteria and nitrates following the rains of June 1963.

There is some conflict in the evidence as to how the well became contaminated. The plaintiffs' theory is that polluted water from Level Creek was transported into their well by means of seeping through the alluvium bed of Level Creek into the unused dug well down into the Fort Riley limestone, the water bearing strata in the area, and thence into the drilled well, Atkinson's source of water supply. The evidence supporting plaintiffs' theory, and upon which the trial court based its findings, consisted mainly of the testimony of Willis Waterman, a consulting geologist, corroborated to some extent by the testimony of Henry V. Beck, a professor of geology at Kansas State University.

Waterman inspected the premises and made geological charts of the subsurface rock and shale formations by using various outcroppings of rock and shale in the area, as reference points. Briefly, his testimony was that the bed of Level Creek was of porous alluvium, which is full of water and that it transported the contamination into the dug well. Both the dug well and the drilled well had as their source of water the Fort Riley limestone and, hence, the contamination in the drilled well. Waterman supported his testimony by mathematical and hydraulic calculations. He testified that even though the surface slope was from the Atkinson drilled well toward the stream the "dip or strike" of the Fort Riley limestone was in the opposite direction or sloped from the creek and dug well toward the drilled well. He described the effect of water pressure at the stream level as causing the rapid rate of movement of polluted water through the Fort Riley limestone into the drilled well. He further testified that normally Fort Riley limestone carries

.88 to 25 parts per million of nitrates and that contamination of the Atkinson well came from Level Creek. He testified the well could not be contaminated from the Atkinson feedlot because the feedlot rested on impermeable Creswell limestone, located near the surface of the ground at the well, and that there was a good steep drop in all directions away from the well. He further testified that he made his analysis and completed his investigation to determine the source of contamination of the well water prior to learning of the high concentration of nitrate in the creek.

Professor Beck testified as a witness for the defendants. His testimony as to the geological formations of the area generally conformed to that of Waterman. His testimony differed from Waterman's as to the rate water would move through the Fort Riley limestone. Beck made his inspection of the premises in 1964, at a time when the ground was covered with two or three inches of snow. He did not see the old dug well but was informed of its presence by Mrs. Atkinson. He testified that while the Fort Riley limestone is the main aquifer in this area, the Towanda limestone strata, several feet higher than the Fort Riley, sometimes contained water and probably was an adequate water supply for the dug well.

While, as we have indicated, there is some conflict in the testimony of Waterman and Beck, it is resolved by the findings of the trial court and cannot be disturbed by our review on appeal. This court has said many times that where findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the power of this court begins and ends in determining whether there is any competent substantial evidence to support the findings, and when they are so supported they are accepted as true and will not be disturbed on appeal. (*Walz v. Tompkins, Administrator,* 188 Kan. 106, 360 P. 2d 868; *McNally Pittsburg Mfg. Co. v. Western Union Telegraph Co.,* 186 Kan. 709, 353 P. 2d 199; *Dennis v. Smith,* 186 Kan. 539, 352 P. 2d 405; *Foy Construction Co. v. Board of Education,* 183 Kan. 25, 325 P. 2d 53.) In view of what has been said we hold there is substantial competent evidence in the record to support the trial court's findings that the water in Level Creek and the well on plaintiffs' property were polluted and contaminated as a result of the operation of defendants' feedlots.

Herington complains of a conclusion of the trial court that the right to recovery results from the defendants having a harmful substance on their land and permitting it to escape to the damage

of the plaintiffs. Herington says this is tantamount to a ruling that runoff from cattle pens is a harmful substance per se. We cannot agree with Herington's construction of the trial court's conclusion. Read together with other findings and conclusions, we construe the ruling complained of to mean that runoff becomes a harmful substance when it consists of contaminating bacteria and chemicals in such an amount as to produce excessive pollution resulting in injury. We believe the evidence, which has been related, to be sufficient to justify such a conclusion on the part of the trial court. The fact that a business is a lawful one does not exempt it from liability when contaminated or polluted water escapes onto the land of others in such quantities as to cause injury. (*Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P. 2d 953.)

Defendants specify several points wherein it is claimed the trial court erred in awarding damages. These points are interrelated and will be treated together. Defendants claim the trial court erred in awarding $10,000 as damages to real property. On this point the plaintiffs submitted testimony of an official of the Shawnee Milk Producers Association and that of an operator of a Grade A dairy business, in the area, which showed the importance of a water supply in the operation of a Grade A dairy. A local real estate broker, who was also engaged in the cattle business, and a neighboring farmer and dairyman testified as to the effect of water pollution on the reasonable market value of the farm. They fixed the loss in market value in an amount of more than $16,000. Atkinson testified the market value of the farm was $36,000 prior to June 1963 and $16,000 thereafter. Defendants offered no evidence as to the market value of plaintiffs' farm.

Defendants also complain concerning the trial court's award of damages for loss of milk production. The Atkinsons' milk production records, compiled by the Shawnee Milk Producers Association, for the years 1962, 1963 and 1964, were received in evidence. Analysis of the records disclose that in 1962 Atkinsons received 10,627.5 pounds of milk per cow; in 1963, 8,837.9 pounds per cow; and in 1964, 6,912.2 pounds per cow. From the records referred to Atkinsons computed a dollar loss in the amount of $6,782.96. The court awarded damages in the amount of $5,000 for loss of milk production.

Dr. Oehme, a veterinarian from Kansas State University, and Dr. L. D. Jernigan, a veterinarian of Council Grove, testified that

nitrates in water would have a deleterious effect on the health of animals and probably cause a decrease in milk production. Their testimony also supported that of plaintiffs as to the damage to the health of Atkinsons' cows and calves, and loss by death and abortion as well as the loss incurred by Atkinsons in the sale of some of their cows.

We have examined the record as to evidence with respect to other items of damages awarded by the trial court and find it sufficient in each instance to support the trial court's decision.

Defendants complain the trial court erred in awarding damages on a basis of a permanent loss of water. We are unable to find any such specific ruling of the trial court. In this connection we note that geologist Waterman testified that it would take five years to reduce by one-half the nitrate content in the Atkinsons' well and five years more to again reduce it one-half if the stream flow would cease immediately in Level Creek. Waterman also testified that from his examination of the Atkinson property it would not be feasible to drill another well. In this connection defendants attempted to introduce evidence by a witness, Caylor, a well driller from Manhattan. Caylor was asked if there would be nitrates in other wells upon the property. On objection the court did not permit his testimony for the reason he was not qualified as an expert on this point. Defendants claim error in this regard. However, it is not included in their statement of points on appeal and even if meritorious the contention cannot be considered on appellate review. (Supreme Court Rule No. 6[d], 197 Kan. LXI, LXII; *Board of County Commissioners v. Brookover,* 198 Kan. 70, 422 P. 2d 906.)

In summation it may be said there is sufficient competent evidence to sustain the trial court's award of actual damages.

Herington argues the trial court erred in holding plaintiffs had done everything reasonable to mitigate their damages. In this connection the record discloses Atkinsons followed the advice of their veterinarian, Dr. Jernigan, that of various state agencies and the Shawnee Milk Producers Association, in attempting to alleviate their problems. On the recommendation of the Shawnee Milk Producers Association, and also that of their veterinarian, a chlorinator was installed in the well. In early October 1963, soon after the contamination was discovered, Atkinsons sought the advice of their veterinarian and others, as well as Kansas State University,

concerning sickness in their herd. On the advice received, they supplemented their livestock feed with vitamin A. When sickness continued in the herd, on the advice of veterinarians and Kansas State University, they commenced hauling water from their other farm, as well as from White City. They employed a geologist who advised it would be futile to attempt to drill another well. We believe the trial court's holding in this regard is fully supported by the evidence.

We turn next to the contention of both defendants that the evidence does not support an award of punitive damages. Our examination of the record in this regard compels us to agree with the position taken by defendants. In finding No. 17 the trial court stated the pollution of the water in the well and Level Creek had been called to the attention of Herington on repeated occasions and that such complaints were ignored. We do not find evidence to support such a finding. The feedlots were constructed and put into operation in the fall of 1961. There were no complaints about pollution during the first eighteen months of operation. When first notified of the fish kill and possible pollution Herington immediately constructed two ponding areas or lagoons, below the cattle pens. The lagoons were constructed on the recommendation of Dr. Hudelson, a veterinarian for the State Livestock Sanitary Commissioner.

Victor Lewerenz, president of Herington, accompanied various officials in taking water samples and in inspecting the premises. Ralph Bowman, manager of Herington, met with representatives of the Shawnee Milk Producers Association shortly after the first notice of pollution. A letter addressed to Mr. Bowman, dated August 1, 1963, from the manager of the Shawnee Milk Producers Association, complimented Mr. Bowman on his spirit of cooperativeness and willingness to make every effort possible to correct the situation. The letter also mentioned Herington's program of settling ponds as follows:

"The program of arranging the settling ponds surely will take care of everything in good shape. Thank you once again for your help."

Herington participated in arranging for meetings with representatives of the State Board of Health, the State Livestock Sanitary Commissioner, city officials of the City of Herington, and several veterinarians. The first meeting was held on August 6 and the second on September 6, 1963. Procedure for the elimination of the pollution of Level Creek was discussed at these meetings. Hering-

ton retained the engineering firm of Schwab, Eaton & Associates to prepare plans for the abatement of the pollution problems. These plans called for the construction of more settling ponds or lagoons and an irrigation system to dispose of the feedlot runoff collected therein. The plans were approved by the State Board of Health and construction was in progress at the time of the trial. The evidence discloses that cattle feeding is a common business enterprise in the area, although the large number such as the maximum fed by defendants was unusual.

It is further to be noted that, even though possible pollution of Level Creek might have been anticipated, contamination of the Atkinson well by reason of the coincidental chain of circumstances consisting of the location of the old dug well, and the characteristics of the geological formations surrounding it, certainly would have been beyond reasonable anticipation. The undisputed evidence discloses that defendants operated the feedlots for eighteen months without complaint and when notified of pollution took immediate, although as developed ineffective, measures to alleviate the situation. Considering the undisputed evidence on this point as a whole, we are unable to find the malice, vindictiveness, indifference or gross and wanton conduct necessary to justify an award of punitive damages.

The evidentiary requirements for an allowance of punitive or exemplary damages have been set out and discussed by this court on many occasions. The earliest Kansas cases indicate that damages, sometimes called exemplary, vindictive, or punitive, are permitted wherever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. (*Malone v. Murphy*, 2 Kan. (2nd Ed.) 245; *Wiley v. Keokuk*, 6 Kan. (2nd Ed.) * 94, and *Cady v. Case*, 45 Kan. 733, 26 Pac. 448.)

The attitude of this court consistently adhered to is well expressed in *Stalker v. Drake*, 91 Kan. 142, 136 Pac. 912:

". . . Such damages are allowable not because of any special merit in the plaintiff's case, but are imposed by way of punishing the defendant for malicious, vindictive or a willful and wanton invasion of the plaintiff's rights, the purpose being to restrain him and deter others from the commission of like wrongs. Such damages are only given where malice, fraud or a willful and wanton disregard of the rights of others enter into the case. . . ." (p. 150.)

The rule quoted was adhered to in *Chessman v. Felt*, 92 Kan. 688, 142 Pac. 285, where it was further stated:

". . . Ordinarily fraud, oppression or wanton disregard of the plaintiff's rights is essential. . . ." (p. 693.)

See, also, *Allman v. Bird,* 186 Kan. 802, 353 P. 2d 216; *Watkins v. Layton,* 182 Kan. 702, 324 P. 2d 130; *Will v. Hughes,* 172 Kan. 45, 238 P. 2d 478; *Motor Equipment Co. v. McLaughlin,* 156 Kan. 258, 133 P. 2d 149; *Stoner v. Wilson,* 140 Kan. 383, 36 P. 2d 999; and *Roseberry v. Scott,* 120 Kan. 576, 244 Pac. 1063.

Cases cited by plaintiffs involving water pollution, with respect to punitive damages, deal with the escape of salt water from oil field operations. In each instance the conduct complained of was said to be intentional or deliberate with full knowledge of the consequences and indifference thereto. In *Donley v. Amerada Petroleum Corp.,* 152 Kan. 518, 106 P. 2d 652, the conduct of one of the defendants was described as follows:

". . . That the acts of the Shell were intentional, with full knowledge of their character and without cause or excuse is established by clear, strong and convincing evidence. There was not only circumstantial, but direct evidence its acts were deliberate. . . ." (p. 524.)

In *Rusch v. Phillips Petroleum Co.,* 163 Kan. 11, 180 P. 2d 270, defendants ignored the warning of the state geologist that their slush ponds were seeping salt water, such conduct was described as the intentional doing of a wrongful act with full knowledge of its character and without cause or excuse. Such action was held to be malicious and to warrant an award of exemplary damages.

The conduct of defendants in the case at bar cannot be described in terms of the language used by this court in defining conditions warranting the award of punitive damages. A search of the record fails to reveal any evidence of conduct by either defendant that could be characterized as malicious, vindictive, oppressive, fraudulent or a willful and wanton disregard of plaintiffs' rights. Therefore, the judgment of the trial court awarding punitive damages against both defendants must be set aside.

We turn next to the contention of defendant Swift that, irregardless of the liability of defendant Herington, there is no evidence to establish that Swift, through any of its agents or employees, either performed or failed to perform any acts causing the damages claimed by Atkinsons. Swift contends the trial court erred in finding Swift and Herington to be engaged in a joint venture, and further erred in finding that the terms of the contract reduced the status of Herington to that of a hired man. Swift takes the position that the true relationship between it and Herington, under their contract, was either that of employer-independent contractor or bailor-bailee. In determining the relationship of Swift and Herington, it

becomes necessary to review pertinent provisions of the contract. An examination of the contract reveals the general duty to feed and care for Swift's cattle was imposed on Herington. However, specific controls were expressly left to the direction of Swift. In this connection we find provisions for sorting, regrouping and cutting out livestock from the various pens from time to time *as may be directed by Swift;* the feeding operation shall be conducted *as may be directed by Swift;* feed and grain shall be mixed and prepared *as directed by Swift;* Herington shall be responsible for loading out livestock *as directed by Swift;* Herington shall provide equipment to steam roll grains at any time upon *thirty days' written notice by Swift;* Herington shall provide an office on the premises for Swift's nutritionist; and Herington shall have a manager or supervisor on the premises to whom Swift may communicate directions with respect to the various operations. (Emphasis added.) The contract clearly gives Swift control of the number of cattle to be fed up to the maximum. Swift agreed to furnish all feed supplies, and Herington agreed to furnish storage facilities therefor. Title to all cattle and feed remained in Swift, and Swift was to make payments every two weeks to Herington on a per head per day rate. The duty to maintain clean and healthy feedlot conditions, and to remove manure, was imposed on Herington and title to manure, after it was removed from the premises, was in Herington.

The basis upon which the trial court concluded that Swift was jointly and severally liable with Herington is to be found in conclusions of law Nos. 2 and 5 above quoted. Conclusion No. 2 appears to be the rule as stated in 56 Am. Jur., Waters, § 416, p. 834:

". . . When two or more persons, by their concerted action, pollute a stream, to the injury of another through whose land the stream flows, they are jointly and severally liable for the wrongdoing, and the injured party may, at his option, institute an action, and recover against one or all of those contributing to his injury. . . ." (pp. 835, 836.)

While there is some difference in the facts from those of the case at bar, the petition in *McDaniel v. City of Cherryvale,* 91 Kan. 40, 136 Pac. 899, charged two defendants with wrongfully polluting a stream by concurrent action. In *McDaniel* the rule above quoted was held to apply and stated verbatim in paragraph 1 of the syllabus. Similar holdings may be found in *Luengene v. Power Co.,* 86 Kan. 866, 122 Pac. 1032; *Arnold v. Milling Co.,* 86 Kan. 12, 119 Pac. 373; and *Kansas City v. Slangstrom,* 53 Kan. 431, 36 Pac. 706.

We believe what has been said effectively disposes of Swift's

contention, nevertheless we have examined the arguments presented.

Swift contends the trial court erred in finding Swift and Herington were engaged in a joint venture. Swift argues, and we are inclined to agree, that the relationship cannot be held a joint venture under the holding of this court in *Stricklin v. Parsons Stockyard Co.*, 192 Kan. 360, 388 P. 2d 824. We agree that some of the essential elements of a joint venture, enumerated in *Stricklin*, are not to be found in the contract under examination, namely; sharing in profits and losses. However, as we have indicated, the ultimate disposition of the issue by the trial court was correct. Its reasoning as to a joint venture, though erroneous, is immaterial.

Swift contends the true relationship established by the contract was that of a bailment for agistment purposes. Our attention is directed to *Hughes v. Atkinson*, 188 Kan. 413, 362 P. 2d 618. In *Hughes* the contract was for the grazing of cattle. It was spoken of as a kind of bailment, technically termed an agistment contract. In 3 C. J. S., Animals, § 15, p. 1107, an agistment is described:

"Agistment is the pasturing of cattle or similar animals as a bailee in consideration of an agreed price to be paid by the owner."

While there are some similarities between an agistment contract and that under consideration here, there are many distinguishable characteristics. This contract contemplates a finishing rather than a grazing cattle operation. They are two entirely different processes; grazing requires much land and little personal services, while finishing requires little land and extensive personal services. While an ordinary feedlot finishing process might be termed a bailment, the provisions of the contract in this case go far beyond the characteristics of an agistment.

Even though the relationship existing here should be termed a bailment as Swift insists, relief from liability does not necessarily follow. While a bailor generally is not liable to third persons for damages resulting from the bailee's use of the bailed property, the bailor remains liable, however, where he retains control of the bailed property through himself or an agent or employee. (8 C. J. S., Bailments, § 40 [a], pp. 476, 478.) As we have indicated, Swift not only retained essential control but has provided for the presence of and supervision by its own direct employee, the nutritionist.

In view of the foregoing, it is manifest the position of Swift cannot be sustained by any of the arguments advanced.

The judgment of the trial court is reversed as to the award of punitive damages and is affirmed in all other respects.