0488

Charles T. TANT and Ann M. Tant, Respondents, v. DAN RIVER, INC., Appellant; H. B. LYNN and Lona C. Lynn, Respondents, v. DAN RIVER, INC., Appellant; Viola S. PARRISH, Respondent, v. DAN RIVER, INC., Appellant; Kathleen S. DuBOSE, Respondent, v. DAN RIVER, INC., Appellant.

(332 S. E. (2d) 534)

Court of Appeals

*John P. Britton* and *N. Heyward Clarkson, III*, both of *Rainey, Britton, Gibbes & Clarkson*, Greenville, *for appellant.*

*Joseph G. Wright, III*, Anderson; *for respondents.*

*R. W. Dibble, Jr.*, of *McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble*, Columbia, *for the S. C. Chamber of Commerce, amicus curiae.*

Heard Dec. 18, 1984.

Decided June 3, 1985.

GOOLSBY, Judge:

In these consolidated actions based primarily on alleged acts of negligence, gross negligence, recklessness, willfulness, and wantonness that damaged real and personal property belonging to the respondents Charles T. and Ann M. Tant, H. B. and Lona C. Lynn, Viola S. Parrish, and Kathleen S. DuBose, Dan River, Inc., appeals from the judgments rendered in favor of the respondents following a jury trial. The issues on appeal relate to the awards of punitive damages and to the admissibility of certain evidence. We affirm the awards of actual damages and reverse the awards of punitive damages.

The respondents, who are residents of Easley, South Carolina, allege that between November 18, 1980, and either the latter part of April or the first part of May, 1981, Dan River's Easley plant emitted a black, tarry soot that fell

upon and damaged their respective homes and items of personal property. The jury awarded the Tants $5,500.00 actual damages and $12,500.00 punitive damages, the Lynns $600.00 actual damages and $7,500.00 punitive damages, Parrish $250.00 actual damages and $7,500.00 punitive damages, and DuBose $400.00 actual damages and $7,500.00 punitive damages.

During the trial, the respondents introduced a vial containing material they said represented a sample of the substance that fell on their properties and a report relating to an analysis of the sample material. Dan River objected to the introduction of both the sample material and the report.

## I.

Dan River maintains that the evidence does not support the awards of punitive damages. We agree.

Dan River operates a manufacturing plant or mill in Easley, South Carolina, powered by a coal-fired boiler system. A tall smoke stack serves the system's boilers.

The Tants were the first to complain to Dan River about oily, black soot. They called Dan River on November 20, 1980, two days after the soot allegedly accumulated on their house and yard and stuck to their motor vehicles. There is no evidence that Dan River's operation of its Easley mill had previously prompted any complaints to Dan River about soot discharges from its smoke stack. In fact, one month prior to the incident in question, Dan River's operation of the mill was judged to be in compliance with all air pollution control regulations and standards of the South Carolina Department of Health and Environmental Control (DHEC).

Immediately after the Tants complained of the soot, Dan River sent representatives to visit them and to inspect their property. Dan River also employed J. E. Sirrine Company to inspect its boiler facilities. At Sirrine's suggestion, Dan River completely rebuilt its primary boiler and installed an over-fire air fan system at its Easley mill. Dan River also retrained its boiler operators. By April 15, 1981, approximately five months after receiving the first complaint, Dan River's emission problems were remedied.

In South Carolina, punitive damages are recoverable when a defendant's acts are willful and wanton or are so grossly negligent or reckless as to imply willfulness and wantonness. *Sample v. Gulf Refining Co.*, 183 S. C. 399, 191 S. E. 209 (1937). They are also recoverable where the evidence shows a malicious invasion of the plaintiff's rights. *Fennell v. Littlejohn*, 240 S. C. 189, 125 S. E. (2d) 408 (1962). Punitive damages, however, may not be awarded for mere gross negligence or for inadvertence. *Hicks v. McCandlish*, 221 S. C. 410, 70 S. E. (2d) 629 (1952). "The test by which a tort is to be characterized as reckless, willful or wanton is whether it has been committed in such a manner or under such circumstances that a person of ordinary reason or prudence would then have been conscious of it as an invasion of the plaintiff's rights." *Hinson v. A. T. Sistare Construction Co.*, 236 S. C. 125, 131-32, 113 S. E. (2d) 341, 344 (1960).

Here, no evidence supports a finding that Dan River acted either willfully, wantonly, maliciously, or with a present consciousness of wrongdoing. At most, the evidence shows mere gross negligence or inadvertence.

The respondents placed much emphasis on an internal memorandum written two months after the soot problem arose and during the time Dan River was undertaking corrective measures. The memorandum recites that the "Easley boiler installation has been a matter of increasing concern for the last few years" and that the "boilers have been on the 'ragged edge' for years as far as the air pollution regulations are concerned." While the boilers operated on the "ragged edge," they nevertheless enjoyed DHEC approval.

We recognize that Dan River's boilers and smoke stack were old at the time the pollution occurred; however, this fact, without more, affords no basis for an award of punitive damages. *See Newman v. Nelson*, 350 F. (2d) 602 (10th Cir. 1985). To justify an award of punitive damages, the record should include proof that the boiler installation was persistently, recklessly, or indifferently maintained. *Id.* The record here contains no such proof.

Although no South Carolina precedent exists, courts elsewhere have denied punitive damages where the defendant, upon learning of a problem, takes reasonable steps to end or minimize any damage to the plaintiff and there is neither

any evidence of any wrongful intent on the defendant's part to injure the plaintiff or his property nor any evidence of any conscious or willful disregard by the defendant of the plaintiff's rights. *See Harrison v. Indiana Auto Shredders Co.*, 528 F. (2d) 1107 (7th Cir. 1976); *Earl v. Clark*, 219 N.W. (2d) 487 (Iowa 1974); *Lacy Feed Co. v. Parrish*, 517 S.W. (2d) 845 (Tex. Civ. App. 1974) (error refused NRE); *Atkinson v. Herington Cattle Co.*, 200 Kan. 298, 436 P. (2d) 816 (1968); *Newman v. Nelson, supra; Laurel Equipment Co. v. Matthews*, 218 Miss. 718, 67 So. (2d) 258 (1953). The cases brought by the Tants and the others fall within this rule.

The submission to the jury of the issue of punitive damages, then, was unwarranted.

## II.

Dan River next contends that the trial court erred in admitting in evidence a vial of sample material and a DHEC report containing an analysis of the sample material.

Dan River states in its exceptions that the sample material and the report based upon the sample material were irrelevant because "it was not sufficiently proven that the sample material was representative of the effluents allegedly deposited on the ... respondent's propert[ies] by [Dan River]" and because the respondents failed to establish a complete chain of evidence of the sample material prior to its analysis by DHEC.

■ Dan River's first ground of objection goes to the weight of the evidence and not to its admissibility.

Moreover, the representative character of the sample material was established since testimony showed that it consisted of a substance collected on the same day off the surface of two different vehicles, one belonging to the Tants and the other to the Duboses. Chemical analysis indicated the sample material matched a fly ash sample subsequently collected at Dan River's plant.

■■ At any rate, the question of whether the sample material was relevant rested largely within the discretion of the trial judge. *See Ward v. Liberty Life Ins. Co.*, 232 S. C. 582, 103 S. E. (2d) 48 (1958); *Neal v. Clark*, 199 S. C. 316, 19 S. E. (2d) 473 (1942). Clearly, the sample material was relevant. It legally tended "to prove, or make more

or less probable some matter in issue." *Gause v. Livingston,* 251 S. C. 8, 13, 159 S. E. (2d) 604, 607 (1968). In this instance, a "matter in issue" was whether a discharge from Dan River's plant fell on the respondents' homes and motor vehicles.

As to the chain of evidence argument, we recognize that the party offering a specimen is required to establish, as least as far as practicable, a complete chain of evidence from the time the specimen is first acquired until it is taken to the final custodian by whom the specimen is analyzed. *Benton v. Pellum,* 232 S. C. 26, 100 S. E. (2d) 534 (1957). Proof, however, "need not negate all possibility of tampering" and "[w]here the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and the analysis." *Id.* at 33-34, 100 S. E. (2d) at 537.

In this instance, the testimony completely established the chain of evidence from the time the sample material was collected until it reached the DHEC laboratory. The vial containing the sample material was identified by the party who supervised the substance's collection and by the laboratory technician at DHEC who ultimately received and analyzed it. Those who had custody of the sample material between the time it was collected and the time it was analyzed also testified. No evidence was presented to suggest the vial was tampered with.

The trial judge, therefore, did not abuse his discretion in admitting in evidence the vial containing the sample material and the report from DHEC.

Affirmed in part and reversed in part.

CURETON, J., concurs, and GARDNER, J., dissents.

GARDNER, Judge (dissenting):

I disagree with my brethren of the majority opinion. I would affirm the award of punitive damages made by the jury.

Where a jury verdict in a tort case is supported by a scintilla of relevant and credible evidence of record, the verdict must be affirmed on appeal. *Jones v. Sun Publishing Co.,* 278 S. C. 12, 292 S. E. (2d) 23 (1982).

Dan River's manufacturing business in Easley, South Carolina, involved the use of two coal burning furnaces from which a gaseous residue was emitted through a tall smokestack into the neighboring atmosphere. Immediately prior to November 1980 the furnaces were twenty-five years old and very much in need of repair. The smokestack was about seventy years old. Plaintiff's complaints allege that prior to the middle of November 1980 the emissions seemed tolerable to them. They then alleged that on or about that date, there was suddenly ejected from the smokestack a tarry soot which damaged their property. Dan River was notified. It sought first to buy time by assuring plaintiffs that it was taking steps to avoid polluting the atmosphere. It then repaired the old furnaces and by the first of April 1981 the problem was apparently corrected.

Dan River contends and the majority opinion holds that because it acted diligently when notified of the initial pollution and finally corrected the situation, the award of punitive damages constitutes error.

There is foreign authority, as noted in the majority opinion, that where the first alleged fact of injury and damage occurs without foreknowledge or reason to believe that it might happen, punitive damages are not recoverable if the defendant then took all reasonable steps to prevent a reoccurrence.[1] This is not the case before us.

The complaints allege that both the initial serious pollution in November 1980 and subsequent pollutions after notice was given of the first serious pollutions, were acts of recklessness, willfulness and wantonness.

The record is replete with evidence that Dan River before the initial pollution of November 1980 had foreknowledge of and good reason to believe that there was a likelihood that its operation might pollute the atmosphere and damage the property of plaintiffs. This foreknowledge created a duty on the part of Dan River to avoid tortiously polluting the atmosphere. There is evidence of record supporting the jury's finding that the breach of this duty constituted recklessness, willfulness, and wantonness as plaintiffs alleged.

---

[1] Dan River in its brief admits there is no South Carolina authority but cites, *Newman v. Nelson*, 350 F. (2d) 604 (10th Cir. 1965), *Atkinson v. Herrington*, 200 Kan. 298, 436 P. (2d) 816 (1968) and *Laurel Equipment Co. v. Matthews*, 218 Miss. 718, 67 So. (2d) 258 (1953).

The boilers which caused the pollution were twenty-five years old and in need of repair before November 1980. Through discovery, plaintiffs unearthed and introduced as evidence interoffice memoranda of the offices of the defendant. Among these is a letter of November 24, 1980 from John R. Hall, Division Engineer for Dan River which contained the following:

> The boiler [which caused the pollution] is operating as well as it can under the conditions of age and type. The boiler is about twenty-five years old, is in poor mechanical shape because of age, and has no external means of removing the fly ash from the stack discharge. The only means that we have for controlling fly ash discharge is in operator procedures[2] ....

On November 24, 1980, John Holder wrote:

> I want to remind all of us that we are on the ragged edge with the Easley boilers when it comes to operating with a clean, acceptable stack discharge.

On February 9, 1981, Mr. Hall wrote:

> ... The Easley boiler installation has been a matter *of increasing concern for the last few years.* ... These boilers have been on the "ragged edge" for years as far as the air pollution regulations are concerned. (Emphasis ours.)

Under the law of this state, punitive damages are allowed for a tort which is reckless, willful and wanton. *Martin v. Martin,* 262 S. C. 168, 203 S. E. (2d) 385 (1974) in pertinent part reads:

> The test for determining whether a tort may be deemed reckless, willful or wanton is whether it has been committed in such a manner and under such circumstances that a person of ordinary reason or prudence would have been conscious of it as an invasion of the rights of the injured party.

---

[2] The operator procedures were inadequate as admitted in a later letter of John Hall.

I would hold that the evidence of record supports the jury's finding that a person of ordinary reason or prudence would have been conscious of the danger presented by the twenty-five year old boilers which admittedly were on the "ragged edge" of safety and that the initial pollution, and therefore its continuance, was a reckless, willful and wanton tort. I would accordingly affirm the punitive damages award.

The majority opinion asserts, with great importance attached thereto, that in the Fall of 1980 there had been a DHEC inspection and Dan River was found to be in compliance with DHEC regulations. What an inspection! Dan River had a liaison office to maintain liaison, and inferentially good-will, with DHEC. The DHEC officer who testified admitted that before the inspection he notified Dan River. His inspection was a visual observation of the smokestack for about 30 minutes. This type inspection occurred just once a year and before it occurred, as noted, Dan River was notified.

Throughout the testimony of this case the offices of Dan River admitted that the boiler operators were crucial in preventing pollution and that much depended upon the boiler operator to remove ash and cinders from the boiler so that they would not be injected into the air. In fact the very first consideration is the boiler operator. As late as March 24, 1981, Mr. Hall complained to the Chairman of the Board of Directors of Dan River thusly:

> My purpose in writing is to raise the point of operator requirements for the rebuilt boiler. As I understand it, a fireman is used full time in the boiler room on the first shift; however, on the off shifts I understand that a shop employee fires the boiler as part of his job.

And in addition to the questionable validity of the prearranged visual inspection by DHEC, another inspection was made less than two months after the DHEC inspection by an expert employed by Dan River; he made visual observations of the emissions and also a complete inspection of the internal operation of the boilers and the operation thereof. His inspection reflected gross violations of DHEC regulations. The jury had before it all of this information. A DHEC

agent testified. It was for the jury and not this court to evaluate the credibility and weight of the testimony of the DHEC agent.

For the foregoing reason, I respectfully disagree with my brethren of the majority opinion.

I would affirm the verdict of the jury.