LACY FEED COMPANY, Appellant,

v.

Woodrow PARRISH, Appellee.

No. 5361.

Court of Civil Appeals of Texas, Waco.

Dec. 19, 1974.

Rehearing Denied Jan. 9, 1975.

OPINION

JAMES, Justice.

This is a nuisance case. Defendant-Appellant Lacy Feed Company owns a tract of about 600 acres in Hamilton County, Texas, upon the southeast 50 acres of which it set up and operated a turkey-raising operation. Plaintiff-Appellee Woodrow Parrish is the owner of a 200 acre tract, the approximate north half of which adjoins the Defendant's land on the east, said tracts being separated only by a county road. The following schematic diagram shows the relative locations of Plaintiff's tract and Defendant's tract:

Beard & Kultgen, Charles B. McGregor, Waco, for appellant.

Bobby L. Cummings, Gatesville, for appellee.

Plaintiff Parrish sued Defendant Lacy Feed Company charging Defendant with operating a nuisance, complaining of odor, flies, feathers, dust and water pollution, seeking an injunction to abate same, as well as damages to his land, personal damages for discomfort, annoyance, and inconvenience, and for exemplary damages.

Trial was had to a jury which found:

(1) The operation and maintenance of the turkey pens by Defendant is a nuisance

to Plaintiff from and after November 1, 1970;

(2) That the nuisance is permanent;

(3) That the nuisance has caused material personal discomfort, annoyance, and inconvenience to Plaintiff from and after November 1, 1970;

(4) That his damage for this personal discomfort, annoyance, and inconvenience amounts to $2500.00;

(5A) That Plaintiff's land had a market value of $35,000.00 ($175.00 per acre) immediately before November 1, 1970, and

(5B) Had a market value of $30,000.00 ($150.00 per acre) immediately after November 1, 1970; and

(6) That Plaintiff is entitled to exemplary damages in the amount of $2500.00.

Based upon the jury verdict, the trial court entered judgment in favor of Plaintiff against Defendant for $10,000.00 and costs, said net judgment amount being composed of $5000.00 as damages for loss in market value of Plaintiff's land, $2500.-00 as damages for personal discomfort, annoyance, and inconvenience and $2500.00 as exemplary damages.

Defendant Lacy Feed Company comes to this court upon fourteen points of error which may be combined into four groups for discussion, points one through four relating to the nuisance, points five through eight relating to the issues as to Plaintiff's personal discomfort, annoyance, and inconvenience, points nine and ten relating to the market value of Plaintiff's land, and points eleven through fourteen relating to exemplary damages.

By Defendant-Appellant's first group of points it attacks the legal and factual sufficiency of the evidence to support the jury finding that the operation of the turkey pens was a nuisance; that the trial court erred in not requiring a finding of negligence on Defendant's part in operating and maintaining the turkey pens, and that the

trial court erred in not requiring the jury to find any duty owed by Defendant to Plaintiff and breach of such duty. We overrule these contentions.

The evidence is not only legally and factually sufficient to support the jury's finding that the operation and maintenance of the turkey pens was a nuisance, but such evidence is ample to support such finding.

Plaintiff Parrish, the owner of the 200 acre tract, bought 100 acres of his land in 1945 and the remaining 100 acres in 1959. The land is roughly 40% cropland and 60% range or pasture land. Plaintiff did not live on the property, but lived about two miles away from his property in controversy. There had been a residence house on the north portion of the 200 acres; however, Plaintiff had torn it down in or about the year 1961; however, Plaintiff testified that he had planned to build a new residence house on his land in the approximate location of the old house, and make this his home, and that he would have done so but for the advent of Defendant's turkey operation. Plaintiff had a barn, four surface tanks, two water wells, a water storage tank and watering troughs on his property, all located as shown in the above schematic diagram herein. His surface tanks were stocked with fish and minnows. He ran as many as thirty head of cattle on his place, and did some farming. His main hobby was fishing which he had been accustomed to pursue on his place.

Defendant Lacy Feed Company bought the 600 acre place known as the Cliett place in December 1969. The southeast corner of this place consisted of about 50 to 55 acres of timbered land which drained well, and which portion adjoined Plaintiff's land except for a county road which ran between them. It was on this timbered area of about 50 acres that Defendant erected the turkey pens in question, and commenced to range turkeys in April 1970.

Defendant's operation called for the raising of two turkey crops a year, each crop containing between 50,000 and 60,000

turkeys. The turkeys were normally eight weeks old when they were put on this range, and were usually kept and fed there for ten weeks, after which they were ready for the market and taken from the pens. One crop is normally fed out on this range in the spring and one in the fall, with an intermittent period between crops when the range is empty. As stated, Defendant's first crop of turkeys were put in the pens in April 1970, and then the second crop were put on in the fall of 1970. The offensive odor and dust from the turkey manure were present on Plaintiff's land during the first crop; however, it was during the second crop in the fall of 1970 that the turkeys ate and "stomped" down all the grass and vegetation in the pens. Then when substantial rains came on or about November 1, 1970, a large amount of water ran off from Defendant's turkey pens over upon Plaintiff's land and into Plaintiff's stock ponds, causing a fish kill in his stock ponds. It was at this date and time that Defendant's turkey operation began to be a nuisance. Moreover, during the times when the turkeys were molting, they shed feathers, at which times Plaintiff's land was covered with a large amount of feathers. These feathers and dust got into Plaintiff's water storage tank, thereby polluting what had previously been good. drinking water for human consumption. After this pollution the water was discolored and unfit to drink. Likewise his cattle watering troughs and stock tanks were discolored and polluted. Plaintiff testified that after the rains, the water in his north tanks "at first would be kind of dark brown, then it changed to kind of a green, then it would be almost black." The runoff water from Defendant's pens was full of turkey feathers and manure.

Claude W. Shaffer, an employee of the Department of Agriculture and a retired Air Force Officer, testified that he lived a mile and a half due east of the Cliett place (Defendant's land) for eight and a half years prior to Defendant's turkey operation and that he moved away from this location because of the odors from Defendant's turkey pens. Shaffer testified he normally had to go by these turkeys to go to his mail box, and "when there was a lot of turkeys there (and) wet weather, it would cause me to have to drive about twelve miles farther to keep from going by them, so it wasn't a very good place to live, the noise from the turkeys, the odor." He said the odor was worse during and after rainy spells, and was very offensive to him and worse than the odor of cattle feed lots.

Moreover, the large concentration of turkeys on Defendant's land bred large green flies that came over on Plaintiff's land. Defendant offered testimony from several experts on turkey farming, one of whom testified that good drainage of turkey pens was very necessary, because the flies and maggots they brought about would cause fatal diseases to the turkeys if puddles of water were permitted to stand in the turkey pens. Another of Defendant's experts testified that this concentration of turkeys would normally kill all the trees in four or five years.

Plaintiff testified that as a result of the dust, flies, feathers, odor, and water pollution that he has greatly reduced the amount of time he has spent on his place, and as a result thereof he has "gagged quite often and sneezed frequently," that "at times it's worse than others, at times I almost can't stand it, then again, it's not so bad." He testified "I can't hardly plow for fighting flies off."

Pictures and testimony of witnesses other than Plaintiff corroborated the existence of the dead fish, flies, feathers, dust, odor and water pollution on Plaintiff's property.

Plaintiff's hobby of fishing was ruined by the polluted runoff from the turkey pens, the feathers during certain times of the year covered Plaintiff's property "like snow," his desires to build his home on the place were shattered, and he avoided going to his place for the reasons above stated. Certainly the evidence is ample to support the jury's finding that Defendant's

turkey pens constituted a nuisance. Appellant's points one and two are overruled.

■ Appellant's points three and four assert the trial court erred in not requiring a finding of negligence on the part of Appellant in operating the turkey pens as a prerequisite to determining the same to be a nuisance, and that the trial court should have required the jury to find that Defendant-Appellant owed Plaintiff-Appellee a duty, and that Defendant breached that duty. We overrule these contentions.

This is not the type of nuisance case that requires a finding of negligence. This suit was not brought to recover damages growing out of the negligent operation and location of Appellant's turkey pens, but to recover for the consequences of a voluntary and intentional nuisance, which—it was alleged and found—the operation of Defendant-Appellant's business, situated as and where it was, cast upon Plaintiff-Appellee and his property; that is, the intentional maintenance of the turkey pens inflicted damages that resulted from a substantial invasion of Plaintiff's property and his personal privileges, materially and unreasonably interfering with his personal comfort as well as depreciating the market value of his property.

■ A distinction has been made between acts lawful in themselves done by one on his own premises which *may* result in injury to another if not properly done or guarded, and those which in the nature of things *must* so result; in the former case a person could only be made liable for actual negligence in the performance of the act or mode of maintaining it, while in the latter he would be liable for all his acts, whether guilty of negligence or not. Columbian Carbon Co. v. Tholen (Galveston CA 1947) 199 S.W.2d 825, writ refused; King v. Columbian Carbon Co. (5th Circuit Court of Appeals) 152 F.2d 636; Humble Pipe Line Co. v. Anderson (Waco CA 1960) 339 S.W.2d 259, error refused NRE. Where the things necessary to be done in the operation of a lawful

business cause injury to others, the right to compensation when allowed, is not dependent upon the existence of negligence. King v. Columbian Carbon Co., supra. Appellant's points three and four are overruled.

Appellant's fifth and sixth points attack the legal and factual sufficiency of the evidence to support the jury's finding that Plaintiff-Appellee suffered personal discomfort, annoyance, and inconvenience as a result of the nuisance. We overrule these points. We have already reviewed the evidence showing the personal discomfort, annoyance and inconvenience visited upon Plaintiff-Appellee by the nuisance, and we will not repeat same. Suffice it to say the evidence is ample to support such jury finding.

■ Appellant's point seven complains that Special Issue No. 3 as submitted to the jury (the personal discomfort, annoyance, and inconvenience issue) was improper because it did not restrict the jury to consideration of such matters as would exist to a person of ordinary sensibilities. We do not agree. Special Issue No. 3 was conditioned upon an affirmative finding of nuisance in Special Issue No. 1, and in effect No. 3 inquired if the nuisance "has caused material personal discomfort, annoyance, and inconvenience to the Plaintiff from and after November 1, 1970." To this the jury answered "it has." Then in Special Issue No. 1 the court defined "nuisance" as follows:

"You are instructed that by the term 'nuisance' as used in this charge is meant any condition, brought about by one party in the use of his property, so unusual and excessive that it necessarily causes injury or damage or harm or inconvenience to another party, substantially, materially and unreasonably interfering with the latter's comfort, taking into consideration the nature and use of the property of both parties and the character of community in which they are situated, and which condition would be *substantially*

*offensive, discomforting and annoying to persons of ordinary sensibilities,* tastes and habits living in the locality where the premises are situated."

So we see the court's definition of "nuisance" describes same in the context of being "substantially offensive—to persons of ordinary sensibilities—." Employing the term "nuisance" in this context in Special Issue No. 3, the jury found it to be offensive and annoying to Plaintiff. There is nothing in the record to show Plaintiff Parrish was anything other than a person of ordinary sensibilities.

■ Appellant's eighth point complains that the jury's answer to Special Issue No. 3 permits double recovery (of personal discomfort, etc.) where damage is allowed for diminution to the market value of Plaintiff-Appellee's real property. We overrule this point.

Under the decisions in this state, it is well settled that there can be recovered in a single action damages to permanent injury to land and damages to health or personal discomfort. See Vestal v. Gulf Oil Corp. (Tex.Sup.Ct.1951) 149 Tex. 487, 235 S.W.2d 440, and the cases therein cited. A claim of damages for diminution of value of the use of real estate is not a claim for damages for personal injury. Damages for permanent injury to the real estate comprehends and includes loss of use and enjoyment of the land. *Vestal,* supra. In other words, damage to the *property* of the Plaintiff (which includes loss in market value as well as loss of the use and enjoyment of the property) is one element of damage; whereas, damage to the *person* of the Plaintiff (for personal discomfort, annoyance, and inconvenience) is a separate and distinct, and different element of damage. The evidence in the case at bar supports both elements of damage, and the jury found both. Point eight is overruled.

■ Appellant's points nine and ten attack the legal and factual sufficiency of the jury's findings regarding market value

of Plaintiff's property immediately before and after November 1, 1970. We overrule these points. We have already recited the background facts showing that the nuisance came into being when the heavy rains came on or about November 1, 1970. As above stated, the jury found the market value of Plaintiff's property to be $175.00 per acre or $35,000.00 immediately before the nuisance, and $150.00 per acre or $30,000.00 immediately after the nuisance commenced. These findings are well supported by evidence in the record. Plaintiff testified his property had a market value of $250.00 per acre before November 1, 1970, and a market value of $150.00 per acre after said date. Then James Billingsley, a real estate broker who had lived in this community more than half a century, testified the land had a market value of $210.00 per acre before, and $100.00 per acre after, November 1, 1970. The Defendant's evidence varied greatly from this, and generally showed no damage to the market value as a result of the turkey operation. Where the evidence is conflicting, the jury as trier of fact had the right to choose whom they believed, and to what extent they chose to believe them.

■ Appellant's points eleven through fourteen are directed towards Special Issue No. 6 (concerning exemplary damages) and the jury's answers thereto. Point eleven asserts there is no evidence to support the jury's finding that Defendant-Appellant acted or was actuated by wrongful intent. We sustain this point. Special Issue No. 6 (with the jury's answers thereto) is couched in the following language:

"Do you find from a preponderance of the evidence that plaintiff is entitled to exemplary damages against the defendant?

"Answer: 'He is' or 'He is not'

"Answer: *he is*

"In connection with the above and foregoing special issue you are instructed that before you can assess exemplary

damages you must believe and find from a preponderance of the evidence, if any, that in the operation and maintenance of its turkey pens, from and after November 1, 1970, Lacy Feed Company, through its agents or employees, acted and was actuated by some wrongful intent or with such conscious, intentional and willful disregard of the rights and welfare of the plaintiff as is deemed equivalent to such wrongful intent.

"If you have answered the above special issue 'He is' and only in such event, then state what amount, in dollars and cents, if any.

"Answer in dollars and cents or none.

"Answer: *$2500.00.*"

A careful review of the record shows that Defendant-Appellant Lacy Feed Company and its employees did demonstrate a measure of cooperation after Plaintiff complained to Defendant's employees on or about November 1, 1970, which occurred after the rains caused the first major water pollution and fish kill. To be sure, the cooperation was with some reluctance on Defendant's part and in the climate and background of threatened litigation. Mr. Harold Brown, the closest neighbor living nearby the Defendant's operation testified that Defendant was cooperative when he and Plaintiff complained of the feathers coming over upon their respective properties. In response to these complaints, the Defendant-Appellant placed one-inch chicken wire on their fences on Defendant's south and east property lines adjacent to the turkey pens, in an effort to contain the turkey feathers inside Defendant's property. Mr. Brown testified that this solved his feather problem; Plaintiff testified that it did not, and that he still got a lot of feathers.

Plaintiff complained of the water pollution and fish kill in November 1970; however, Defendant's employees did nothing about it except to telephone to Waco and report same, until February 1971. In the meantime, Plaintiff had employed an attorney, and in February 1971, representatives of Defendant met with Plaintiff and his attorney in Plaintiff's attorney's office in Gatesville, Texas, where a full discussion was had of all problems. Shortly after this meeting, Defendant dug a diversion ditch and set up a levee in a stated effort to divert the water runoff from the turkey pens northward and away from Plaintiff's property. As it turned out, the ditch was not deep enough, and filled up with sediment, and runoff water continued to run over upon Plaintiff's property, involving surface tanks (stock ponds) on the south part of his property in addition to the north tanks previously affected. Months later, after further complaints by Plaintiff and with trial only a short time away, Defendant deepened the ditch and raised the levee, and sent out an engineer to check it. The engineer testified the ditch would carry water runoff to the north and away from Plaintiff's property for rains amounting to 1.9 inches per hour. Plaintiff's testimony was to the effect that this ditch and levee were still ineffective, and that the water runoff was continuing to come upon his property.

From the four corners of the record, there is no evidence of any wrongful intent on Defendant's part to injure the Plaintiff or Plaintiff's property, nor of any "conscious, intentional, and wilful disregard of the rights and welfare" of Plaintiff and his property. The truth of the matter was that Defendant was conducting a business operation that even with the exercise of care was still invading Plaintiff's property and causing him damage.

In view of our disposition of Appellant's point eleven it is not necessary to discuss or pass upon Appellant's points twelve, thirteen, and fourteen.

For the above stated reasons, we affirm the trial court's judgment insofar as it awards Appellee Parrish $2500.00 damages for personal discomfort, annoyance, and inconvenience, as well as $5000.00 damages for loss in market value of Appellee's property, and taxes the costs in the trial

court against Appellant Lacy Feed Co. We reverse and render the award of $2500.00 exemplary damages, to the end that Appellee take nothing by way of exemplary damages.

Costs of this appeal are taxed three-fourths against Appellant Lacy Feed Company and one-fourth against Appellee Woodrow Parrish.

Affirmed in part; reversed and rendered in part.