312 So.2d 799 (1975)
CITIES SERVICE COMPANY, Appellant,
v.
STATE of Florida et al., Appellees.
No. 74-1450.
District Court of Appeal of Florida, Second District.
May 14, 1975.
Rehearing Denied June 9, 1975.
T. Paine Kelly, Jr., W.S. Rodgers, Jr., and Ted R. Manry, III, of Macfarlane, *800 Ferguson, Allison & Kelly, Tampa, for appellant.
Robert L. Shevin, Atty. Gen., and Kenneth F. Hoffman, Asst. Atty. Gen., Tallahassee, for appellees.
GRIMES, Judge.
This is an interlocutory appeal from a partial summary judgment on liability entered against the appellant.
The appellant, Cities Service Company (Cities Service), operates a phosphate rock mine in Polk County. On December 3, 1971, a dam break occurred in one of Cities Service's settling ponds. As a result, approximately one billion gallons of phosphate slimes contained therein escaped into Whidden Creek and thence into the Peace River, thereby killing countless numbers of fish and inflicting other damage.
Appellee, The State of Florida (State), filed suit against Cities Service seeking injunctive relief as well as compensatory and punitive damages arising out of the dam break. The court granted an injunction for a limited period of time and struck the claim for punitive damages. Neither of these points are raised on this appeal. Later the court entered an order granting the State's motion for partial summary judgment on liability. The premise for this order was that Cities Service was liable without regard to negligence or fault for the damage occurring by reason of the escape of the phosphatic wastes into the public waters of the State of Florida.
The determination of this appeal necessarily requires the consideration of the doctrine of strict liability for the hazardous use of one's land which was first announced in Rylands v. Fletcher, 1868, L.R. 3 H.L. 330. In that case the defendants, who were millowners, had constructed a reservoir upon their land. The water broke through into the shaft of an abandoned coal mine and flooded along connecting passages into the adjoining mine of the plaintiff. When the case reached the Exchequer Chamber, Justice Blackburn said:
"We think that the true rule of law is that the person who for his own purposes brings on his land and collects and keeps there anything likely to do mischief if it escapes, must keep it at his peril, and if he does not do so he is prima facie answerable for all the damage which is the natural consequences of its escape."
This statement was limited in the House of Lords to the extent that Lord Cairns said that the principle applied only to a "non-natural" use of the defendant's land as distinguished from "any purpose for which it might in the ordinary course of the enjoyment of land be used."
Since that time there have been countless decisions both in England and America construing the application of this doctrine. Most of the early American decisions rejected the doctrine. However, the pendulum has now decidedly swung toward its acceptance. W. Prosser, The Law of Torts § 78 (4th ed. 1971). According to Prosser, by 1971 the doctrine had been approved in principle by thirty jurisdictions with only seven states still rejecting the principle.
While the application of the doctrine has not been specifically passed upon by the appellate courts of Florida, an early Supreme Court case implies its acceptance. In Pensacola Gas Co. v. Pebbly (1889) 25 Fla. 381, 5 So. 593, the plaintiff claimed damages which resulted when a neighboring landowner constructed a gas works and allowed refuse to spill out onto the land and sink through the sand into the common water thereby polluting the plaintiff's well. The trial court apparently charged the members of the jury that the plaintiff would be entitled to a verdict if they determined that the plaintiff's wells were rendered unfit for use by the defendant without regard to the question of negligence. In affirming a judgment for the plaintiff, the Supreme Court said:
"The appellant gas company had the right to use the water in and about the gas-works as they pleased, but they had *801 no right to allow the filthy water to escape from their premises, and to enter the land of their neighbors. It was the duty of the company to confine the refuse from their works so that it could not enter upon and injure their neighbors, and if they did so it was done at their peril; the escape of the refuse filthy water being in itself an evidence of negligence on the part of the gas company."
Among the cases cited for this proposition was Ball v. Nye, 99 Mass. 582, which was one of the early American decisions approving the strict liability doctrine of Rylands v. Fletcher.
There are two reported circuit court decisions on the subject, both coincidentally arising out of the escape of phosphatic wastes from a reservoir maintained in connection with a phosphate mining operation. In 1953, the Circuit Court of Hillsborough County refused to apply the doctrine of Rylands v. Fletcher in Ague v. American Agricultural Chemical Company, Cir.Ct. Hillsborough Co. 1953, 5 Fla. Supp. 133. Yet, sixteen years later the same court in Caldwell v. American Cyanamid Co., Cir. Ct. Hillsborough Co. 1969, 32 Fla. Supp. 163, adopted the doctrine as limited to the non-natural use of land and denied a motion to dismiss the allegations of the complaint alleging strict liability.
In early days it was important to encourage persons to use their land by whatever means were available for the purpose of commercial and industrial development. In a frontier society there was little likelihood that a dangerous use of land could cause damage to one's neighbor. Today our life has become more complex. Many areas are overcrowded, and even the non-negligent use of one's land can cause extensive damages to a neighbor's property. Though there are still many hazardous activities which are socially desirable, it now seems reasonable that they pay their own way. It is too much to ask an innocent neighbor to bear the burden thrust upon him as a consequence of an abnormal use of the land next door. The doctrine of Rylands v. Fletcher should be applied in Florida.
There remains, however, the serious question of whether the impounding of phosphate slime by Cities Service in connection with its mining operations is a non-natural use of the land. In opposition to the State's motion, Cities Service filed an affidavit of the manager of the plant where the dam break occurred. The affidavit points out that the property is peculiarly suitable for the mining of phosphate and that the central Florida area of which Polk County is the hub is the largest producer of phosphate rock in Florida. It further appears that Florida produced over 80% of the nation's marketable phosphate rock and one-third of the world production thereof in 1973. The affidavit goes on to explain that the storing of phosphate slimes in diked settling ponds is an essential part of the traditional method of mining phosphate rock. Hence, Cities Service argues that its mining operations were a natural and intended use of this particular land.
There have been many American cases which have passed upon the question of whether a particular use of the land was natural or non-natural for the purpose of applying the Rylands v. Fletcher doctrine. Thus, Prosser, supra, states at page 510:
"The conditions and activities to which the rule has been applied have followed the English pattern. They include water collected in quantity in a dangerous place, or allowed to percolate; explosives or inflammable liquids stored in quantity in the midst of a city; blasting; pile driving; crop dusting; the fumigation of part of a building with cyanide gas; drilling oil wells or operating refineries in thickly settled communities; an excavation letting in the sea; factories emitting smoke, dust or noxious gases in the midst of a town; roofs so constructed as to shed snow into a highway; and a dangerous party wall.
"On the other hand the conditions and activities to which the American courts *802 have refused to apply Rylands v. Fletcher, whether they purport to accept or to reject the case in principle, have been with few exceptions what the English courts would regard as a `natural' use of land, and not within the rule at all. They include water in household pipes, the tank of a humidity system or authorized utility mains; gas in a meter, electric wiring in a machine shop, and gasoline in a filling station; a dam in the natural bed of a stream; ordinary steam boilers; an ordinary fire in a factory; an automobile; Bermuda grass on a railroad right of way; a small quantity of dynamite kept for sale in a Texas hardware store, barnyard spray in a farmhouse; a division fence; the wall of a house left standing after a fire; coal mining operations regarded as usual and normal; vibrations from ordinary building contruction; earth moving operations in grading a hillside; the construction of a railroad tunnel; and even a runaway horse. There remain a few cases, including such things as water reservoirs or irrigation ditches in dry country, or properly conducted oil wells in Texas or Oklahoma, which are undoubtedly best explained upon the basis of a different community view which makes such things `natural' to the particular locality. The conclusion is, in short, that the American decisions, like the English ones, have applied the principle of Rylands v. Fletcher only to the thing out of place, the abnormally dangerous condition or activity which is not a `natural' one where it is." (Emphasis supplied)
The American Law Institute has considered this question in §§ 519 and 520 of the Restatement of the Law of Torts (1938).
These sections state:
"§ 519. MISCARRIAGE OF ULTRA-HAZARDOUS ACTIVITIES CAREFULLY CARRIED ON.
Except as stated in §§ 521-4[1], one who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultrahazardous, although the utmost care is exercised to prevent the harm.
"§ 520. DEFINITION OF ULTRA-HAZARDOUS ACTIVITY.
An activity is ultrahazardous if it
(a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and
(b) is not a matter of common usage."
Recognizing the evolving nature of the law in this area, the American Law Institute published Tentative Draft No. 10 in 1964 in which certain changes were recommended for §§ 519 and 520. Thus, in § 519 and § 520 the substitution of the words "abnormally dangerous" is suggested in place of the word "ultrahazardous." In § 520, the following factors are said to be pertinent in determining whether an activity is abnormally dangerous:
"(a) Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others;
(b) Whether the harm which may result from it is likely to be great;
(c) Whether the risk cannot be eliminated by the exercise of reasonable care;
(d) Whether the activity is not a matter of common usage;
(e) Whether the activity is inappropriate to the place where it is carried on; and
(f) The value of the activity to the community."
*803 Referring to these factors, F. James, The Law of Torts, Supp. to Vol. 2, § 14.4 (1968), states:
"The factors to be considered in marking off the area of strict liability are discussed in Comments g through k. One of them deserves special note, the value of the activity to the community. In a sense this factor has already been discounted in making the decision to impose strict liability on an activity. Thus in Comment b to Section 520 it is explained, in distinguishing strict liability from negligence: `The rule stated in § 519 is applicable to an activity which is carried on with all reasonable care, and which is of such utility that the risk which is involved in it cannot be regarded as so great or so unreasonable as to make it negligence to carry on the activity at all. (See § 282.) If the utility of the activity does not justify the risk which it creates, it may be negligence merely to carry it on, and the rule stated in this Section is not necessary to subject the defendant to liability for harm resulting from it.'
"The justification for strict liability, in other words, is that useful but dangerous activities must pay their own way (see text at 801; § 16.9 at 933, infra). There is nothing in this reasoning which would exempt very useful activities from the rule, as is shown by the granting of compensation even where the activity is of such paramount importance to society that it justifies the exercise of eminent domain. And if the law were to embrace wholly the principle of strict liability and its underlying rationale, there would be no place for the consideration of this factor. But this is not the present case. Tort law today contains two opposing strains or principles, strict liability and liability based on fault. It is not surprising, therefore, that any attempt to draw a line between them (which is being done in Section 520) should contain factors which would be irrelevant if one principle or the other alone were being consistently pursued. At any rate this factor will probably continue to influence courts in fact for some time to come."
Some or all of the factors enumerated above recur in most of the cases involving the determination of whether a particular use is natural or non-natural. As applied to the instant case, the first four weigh in favor of the State while the last two favor Cities Service. As in many cases, there is much to be said for both sides.
In the final analysis, we are impressed by the magnitude of the activity and the attendant risk of enormous damage. The impounding of billions of gallons of phosphatic slimes behind earthen walls which are subject to breaking even with the exercise of the best of care strikes us as being both "ultrahazardous" and "abnormally dangerous," as the case may be.
This is not clear water which is being impounded. Here, Cities Service introduced water into its mining operation which when combined with phosphatic wastes produced a phosphatic slime which had a high potential for damage to the environment. If a break occurred, it was to be expected that extensive damage would be visited upon property many miles away. In this case, the damage, in fact, extended almost to the mouth of the Peace River, which is far beyond the phosphate mining area described in the Cities Service affidavit. We conclude that the Cities Service slime reservoir constituted a non-natural use of the land such as to invoke the doctrine of strict liability.
Ordinarily, the determination of whether or not a particular structure or method of operation is natural or non-natural is one which would require the trial court's evaluation of all of the pertinent factors at a trial. However, we believe that in this case the liability may be properly determined by way of summary judgment. The occurrence of the calamity because of an act of God has always been *804 recognized as an exception to the strict liability doctrine of Rylands v. Fletcher. But Cities Service has made no contention that the break in its dam was caused by an act of God. From the transcript of the testimony taken in connection with the injunction proceedings, it is evident that despite the best of care, earthen dams enclosing phosphate settling ponds do give way from time to time without explanation. All of the assertions of Cities Service relative to the need to maintain settling ponds in its mining operations, the suitability of the land for this purpose and the importance of phosphate to the community as well as to the world at large may be accepted at face value. Admitting the desirability of phosphate and the necessity of mining in this manner, the rights of adjoining landowners and the interests of the public in our environment require the imposition of a doctrine which places the burden upon the parties whose activity made it possible for the damages to occur.
Affirmed.
McNULTY, C.J., and HOBSON, J., concur.
NOTES
[1] These sections are not relevant in this case.