438 So.2d 891 (1983)
George BUNYAK and Lillian A. Bunyak, His Wife, Appellants,
v.
CLYDE J. YANCEY AND SONS DAIRY, INC., and the Insurance Company of North America, Appellees.
No. 82-2098.
District Court of Appeal of Florida, Second District.
September 16, 1983.
Rehearing Denied October 18, 1983.
*892 John M. Strickland of Livingston, Patterson & Strickland, P.A., Sarasota, for appellants.
Daniel A. Carlton of Dickinson, O'Riorden, Gibbons, Quale, Shields & Carlton, P.A., Sarasota, for appellee, Clyde J. Yancey and Sons Dairy, Inc.
No appearance for appellee, The Ins. Co. of North America.
CAMPBELL, Judge.
In 1963, George and Lillian Bunyak, the appellants in this case, purchased 100 acres of land in a rural area of Manatee County. They raise cattle and grow hay on this property.
West of appellants' property lies property belonging to Clyde J. Yancey & Sons Dairy, the appellee in this case. Appellee owns approximately 1000 acres and since 1956 has operated a dairy farm on this property.
Central to appellee's dairy operation is a milking barn that stands about one-half mile from appellants' fence line and to the west of a thoroughfare called the Betts Road. Because this property is somewhat higher than the property east of Betts Road, water in this area drains or runs naturally from west to southeast. East of the Betts Road, a natural drainage channel unites with a manmade ditch to form a V. Appellants claim that appellee dug the ditch and altered the natural drainage in the area, while appellee maintains that it only cleaned and cleared an existing ditch. In any event, at the point of the V, a single ditch continues running downhill and into a series of ponds situated towards the rear of appellants' property.
In 1970, manure generated from the dairy farm flowed down onto appellants' property and clogged their ditches. Shortly after this, appellee constructed a large lagoon[1] near the milking barn to hold the liquified manure that ran from the barn at an estimated flow of 14,000 pounds per day. Appellee also built a second lagoon[2] directly behind the first one to store overflow, and because this second lagoon is situated on higher ground, appellee uses an electric pump to push the excess effluent up into it.
One day in November, 1978, George Bunyak and his son decided to go fishing in a pond on their property. Once there, they found the pond covered with a substance which they believed to be manure. They followed the creek upstream, finding it and another pond similarly clogged and filled. They crossed over to appellee's property and followed the flow until they reached the Betts Road at a point where a culvert runs underneath that road. From this vantage point, the Bunyaks saw the substance flowing through the culvert from appellee's anerobic lagoon.
A few days later, appellants' daughter rode one of her horses out near the ponds on her parents' property. She also saw that the ponds were covered with a substance that she also believed to be manure; she said the smell was awful and she feared that her horse would be harmed if it waded into the pond. Following the flow, as her father and brother had done, she soon reached the Betts Road and also saw the substance flowing down from appellee's barn area through the culvert and eventually onto her parents' property.
George Bunyak complained to Clyde Yancey, Jr., who admitted that the pump was *893 broken. After unsuccessfully trying to get appellee to remedy this problem, appellants filed suit seeking compensatory and punitive damages under counts of negligence, strict liability, trespass, and nuisance.
During the trial, there was a dispute over whether the substance flowing onto appellants' property was, in fact, liquified cow manure. Appellee's expert, hydrologist Lloyd Horvath, testified that he had taken two core samples removed from different areas of appellants' property to a geologist at his firm and had asked the geologist to examine these samples and determine which sample came from a manure contaminated pond. Counsel for appellants objected to Horvath expressing the expert opinion of another expert, but the trial court overruled this objection.
During the trial, the court directed verdicts on the nuisance, trespass, and strict liability counts. The jury considered only the negligence count and returned a verdict for appellee. Appellants then filed this appeal, and we now reverse.
Appellants have raised four points on this appeal. They contend that the trial court erred in directing a verdict on the trespass count, that appellee should be liable without fault for the damage to appellants' property, that Mr. Horvath's testimony about the geologist's opinion was inadmissible hearsay, and that the jury ignored the evidence. We need only consider the second and third points raised.
However, before addressing these issues in detail, we note initially that appellee has argued that there was only circumstantial evidence that the anerobic lagoon ever overflowed, the theory apparently being that there was never any evidence that anyone actually ventured to the edge of appellee's anerobic lagoon and saw the manure flowing out. Such direct evidence is not indispensable for it is beyond peradventure that circumstantial evidence is also quite sufficient to prove a case. Neilsen v. City of Sarasota, 117 So.2d 731 (Fla. 1960). See also Sullivan v. State, 430 So.2d 519 (Fla. 2d DCA 1983). The testimony and documentary evidence presented by appellants during their case-in-chief was more than sufficient and from it the jury could have concluded that manure did flow from the lagoon onto appellants' property.
Moving to a consideration of the issues dispositive of this appeal, we find that the trial court erred in permitting the hydrologist to testify regarding an expert opinion given by the geologist. Section 90.704, Florida Statutes (1981), states:
The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, him at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.
This does not permit an expert witness in one field to testify as to the expert opinion given to him by another expert. Such testimony is inadmissible hearsay pursuant to section 90.801(2)(c), Florida Statutes (1981). Everett v. State, 97 So.2d 241 (Fla. 1957), cert. denied, 355 U.S. 941, 78 S.Ct. 432, 2 L.Ed.2d 422 (1958); and State v. Towne, 142 Vt. 241, 453 A.2d 1133 (1982).
The trial court also erred in removing the strict liability count from the jury's consideration. In the oft-cited case of Rylands v. Fletcher, 1868, L.R.3H.L. 330, England adopted the doctrine of strict liability for the hazardous or abnormally dangerous use of one's land. This doctrine is limited to those land uses deemed nonnatural. Subsequently, the doctrine has been adopted in the United States by a majority of jurisdictions. Prosser, Laws of Torts § 78 (1971). American courts, like the English courts, have applied the doctrine to abnormally dangerous conditions or activities not natural to the locality in which they occur.
Our supreme court obliquely applied the Rylands v. Fletcher doctrine as early as 1889 in Pensacola Gas Co. v. Pebley, 25 Fla. 381, 5 So. 593 (1889). There, the defendant gas company, in conducting its operation, discharged filthy water that seeped into the plaintiff's well and rendered the water therein unfit for any use. The court stated:

*894 The appellant gas company had the right to use the water in and about the gas works as they pleased, but they had no right to allow the filthy water to escape from their premises and to enter the land of their neighbors. It was the duty of the company to confine the refuse from their works so that it could not enter upon and injure their neighbors, and if they did so, it was done at their peril, the escape of the refuse filthy water being in itself an evidence of negligence on the part of the gas company.

25 Fla. at 390, 5 So. at 595 (emphasis added).
Eighty-six years later, our court formally adopted and applied the Rylands v. Fletcher doctrine in Cities Service Co. v. State, 312 So.2d 799 (Fla. 2d DCA 1975). In that case, the defendant was found liable without fault when one of its reservoirs broke and discharged phosphate slime into the Peace River, causing tremendous damage. In applying the Rylands doctrine, our court used the codification contained in the Restatement of Torts (Second), sections 519 and 520. These sections suggest imposition of strict liability for damages caused by abnormally dangerous activities and then lists six factors helpful in determining whether an activity is abnormally dangerous.
§ 519. General Principle.
(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.
... .
§ 520. Abnormally Dangerous Activities.
... .
(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.
In discussing these factors, our court noted that the first four factors weighed in favor of the plaintiffs while the final two factors weighed in favor of the defendant; however, though phosphate mining is not an inappropriate activity to the Peace River area and though the industry has significant value to the state and to the nation, our court concluded that:
[T]he rights of adjoining landowners and the interests of the public in our environment require the imposition of a doctrine which places the burden upon the parties whose activity made it possible for the damages to occur.
312 So.2d at 804. We agree with that result, and we find it applicable here. Impounding thousands of gallons of liquified manure on one's property certainly presents some risk to the person, land, or chattels of another. If it escapes, as the circumstantial evidence shows it did here, great harm results. Ineradicable risks attend such impoundment despite reasonable care. Like the slime reservoir in Cities Service, the manure lagoon here is not a matter of common usage, and this, in our view, dovetails with the non-natural use of land to which the common law doctrine and the more modern Restatement doctrine address themselves. Finally, although such activity is not in itself inappropriate to a dairy farm area and although dairy farms have definite value to the community, the same policy considerations that warranted imposition of strict liability in Cities Service apply with equal force here. The testimony and documentary evidence presented by the appellants regarding the overflow from appellee's lagoon and the damages to appellants' property was sufficient to withstand a motion for directed verdict, and the jury *895 should have been permitted to consider this theory of recovery.
Our conclusion that strict liability should be considered here may at first appear to be harsh; however, the calamity which befell the appellants here is neither unique nor without precedent. In fact, liability has frequently been imposed upon landowners for damages caused to neighboring property by water, Dye v. Burdick, 262 Ark. 124, 553 S.W.2d 833 (1977), by flowing effluent, Atkinson v. Herington Cattle Co., 200 Kan. 298, 436 P.2d 816 (1968), or by other noxious substances. Tinsley v. Monson & Sons Cattle Co., 2 Wash. App. 675, 472 P.2d 546 (1970). Though the liability imposed may travel under different names, the result, as a practical matter, is an application of the principles of strict liability. As Professor Prosser noted:
Actually even the jurisdictions which reject Rylands v. Fletcher by name have accepted and applied the principle of the case under the cloak of various other theories. Most frequently, in all of the American courts, the same strict liability is imposed upon defendants under the name of nuisance.
... .
There is in fact probably no case applying Rylands v. Fletcher which is not duplicated in all essential respects by some American decision which proceeds on the theory of nuisance; and it is quite evident that under that name the principle is in reality universally accepted.
Law of Torts § 78 at 512, 513.
We agree with Prosser's observation and note that the instant case could as easily be decided under a nuisance theory. Our conclusion is borne out by the following language in 58 Am.Jur.2d, Nuisance § 79, where the authors state:
Although it is not a nuisance per se, a dairy, creamery, or milk depot may be a nuisance when operated in such a manner as to disturb seriously the comfort of the occupants of nearby residences, as where it creates unreasonable and harmful noise and vibration, or pollutes the air by smoke, soot, or cinders, or by noxious odors, fumes, or vapors, or pollutes water or soil, or produces injury in other ways.
And for a detailed discussion of the theory of nuisance as it is applied to dairy operations which cause harm to or interfere with the use of the property of another, see 92 A.L.R.2d 974. The application of the nuisance theory to a dairy or similar livestock operation is consistent with our state's general definition of nuisance as an activity which disturbs the free use of one's property or renders ordinary use or occupation of it physically uncomfortable. Jones v. Trawick, 75 So.2d 785 (Fla. 1954); Mayflower Holding Co. v. Warrick, 143 Fla. 125, 196 So. 428 (1940).
Three decisions from two other jurisdictions, all factually very similar to the instant case, clearly demonstrate that liability may be imposed whether under the guise of a nuisance theory or a theory of strict liability. In Neuhoff Bros. Packers, Inc. v. Janek, 405 S.W.2d 233 (Tex.Civ.App. 1966), the defendant, who operated a feed lot, collected manure and other material in some catch basins. When the basins overflowed and polluted a creek running through the plaintiff's property, he sued and recovered under a nuisance theory. Likewise, in Lacy Feed Co. v. Parrish, 517 S.W.2d 845 (Tex.Civ.App. 1974), the plaintiff recovered damages for a nuisance caused by the filthy runoff from the defendant's turkey pens, which entered upon and damaged the plaintiff's property. Although the court applied a nuisance theory, it noted that this was not the type of nuisance case that required a finding of negligence. "Where the things necessary to be done in the operation of a lawful business cause injury to others, the right to compensation when allowed, is not dependent upon the existence of negligence." 517 S.W.2d at 850. The court concluded: "The truth of the matter was the Defendant was conducting a business operation that even with the exercise of care was still invading Plaintiff's property and causing him damage." 517 S.W.2d at 852. Thus, Lacy Feed Co. could as easily have been characterized as calling for the imposition of strict liability.
*896 Finally, and most clearly on point factually, there is Bower v. Hog Builders, Inc., 461 S.W.2d 784 (Mo. 1970). In Bower, the defendant operated a hog farm and maintained upon its farm open septic lagoons filled with hog manure which overflowed and ran onto the plaintiff's property rendering it almost completely useless. Using a nuisance theory, the court affirmed an award of compensatory and punitive damages for the plaintiff.
Bower could likewise have been easily decided under the doctrine of strict liability. We have applied that theory because we believe that our earlier decision in Cities Service requires us to do so. We could have easily reached the same result under a nuisance theory. The conclusion is inescapable that no matter what theory is invoked by a plaintiff whose property is damaged by the lawful activities conducted upon or conditions existing on the land of another, the key consideration will always be that useful but dangerous activities must pay their own way.
REVERSED and REMANDED.
RYDER, A.C.J., and LEHAN, J., concur.
NOTES
[1] This lagoon is called an anerobic lagoon, that is, the organisms within it can only live in the absence of free oxygen. Clark, Water & Water Rights, Vol. 7 (1976). An anerobic lagoon is different from an aerobic lagoon in that the latter fosters organisms that can only exist in the presence of oxygen. Clark.
[2] An aerobic lagoon.