Cecil W. MILLER and Mildred E. Miller, Joint Tenants; Margaret L. Birchenough Testamentary Trust, Donald L. Birchenough, Ansel Tobias and Walter Wright, Trustees; Ruth M. Hollinger, Individually and as Joint Tenant with Delbert Hollinger; John E. Edwards and Kermit C. Edwards, Joint Tenants; Homer Sharpe; Cecil M. Tobias and Frances Tobias, Joint Tenants; Paul F. Westrup and Ardis B. Westrup, Joint Tenants; Jay Brothers; Lyle Brothers, Individually and as Joint Tenant with Patricia R. Brothers; Alvin Engelland; Ansel Engelland; Jack Engelland and Vivian M. Engelland, Joint Tenants; Gerald N. Jones and Donna Jones, Joint Tenants; Robert A. Johannsen; Raymond E. Tobias; Gary Zwick; Lester Colle; Harvey Willhaus and Marilyn Willhaus, Joint Tenants; Wilmor H. Oden; Raphael Roeder and Annabelle A. Roeder, Joint Tenants; Edris Edwards; Edward F. Janda and Anna Mae Janda, Joint Tenants; Harry Zwick; Arthur H. Oden; Joleen J. Ottlinger; and William L. Bemis and Dorothy Bemis, Joint Tenants, Plaintiffs–Appellees,

v.

CUDAHY COMPANY, a Delaware Corporation, and General Host Corporation, a New York Corporation, Defendants–Appellants.

Nos. 87–1502, 87–2283.

United States Court of Appeals, Tenth Circuit.

Sept. 28, 1988.

Rehearing Denied Nov. 1, 1988.

John Logan O'Donnell (Thomas D. Kitch and Ron Campbell, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., and E. Sherrell Andrews and Michael L. Spafford, with him on the brief), Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendants-appellants.

H. Lee Turner (Deborah Turner Carney, Golden, Colo., and Casey R. Law and Lisa A. Beran, with him on the brief), Turner and Boisseau, Chartered, Great Bend, Kan., for plaintiffs-appellees.

Before LOGAN, BARRETT and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

In this diversity action, plaintiffs-appellees claimed that the American Salt Company's (American Salt) salt mining operations caused the pollution of an underground aquifer passing under their farms, resulting in their inability to utilize the water in the aquifer for irrigation. At the time appellees filed their complaint, American Salt was an operating division of defendant-appellant Cudahy Company (Cudahy), which is a wholly-owned subsidiary of defendant-appellant General Host Corporation (General Host). The district court concluded that the pollution emanating from the salt plant constituted a continuing, abatable nuisance causing temporary damages and found appellants liable for $3.06 million in actual damages and $10 million in punitive damages. The court then held the punitive damages award in abeyance and retained jurisdiction over the award pending the presentation of a remedial plan to clean the aquifer. Subsequently, the court abandoned the remedial plan, entered final judgment on the punitive damages award and assessed as costs to appellants certain post-trial expert witness fees.

In this consolidated appeal, appellants contend that 1) appellees' claims are barred by the statute of limitations, 2) the district court's method of calculating actual damages was erroneous as a matter of Kansas law, 3) the court erred in awarding punitive damages, 4) General Host cannot be held liable in the absence of evidence that Cudahy was its *alter ego,* and 5) the court erred in assessing post-trial expert witness fees in excess of the statutory limit. We affirm in part and reverse in part.

The complex historical and factual background surrounding this litigation has been exhaustively detailed by the district court. *See Miller v. Cudahy Co.,* 567 F.Supp. 892, 894–95 (D.Kan.1983) (*Miller I*); *Miller v. Cudahy Co.,* 592 F.Supp. 976, 981–1003 (D.Kan.1984) (*Miller II*). As a consequence, we will provide only a brief overview of the factual setting. We note at the outset that we have carefully reviewed the voluminous trial transcript in its entirety and conclude that the district court's comprehensive factual findings, *Miller II,* 592 F.Supp. at 981–1003, are amply supported by the record.

Appellees are owners and lessees of real property located in Rice County, Kansas. The land is used primarily for agricultural production. American Salt, along with its predecessor, has operated a salt manufacturing plant near Lyons, Kansas since 1908.

Located two miles south of Lyons is Cow Creek, which flows in a southeasterly direction and is a minor tributary of the Arkansas River. Below Cow Creek is the Cow Creek Valley Aquifer (the aquifer), an underground fresh-water stratum which occupies a width of one to two miles and lies at depths of between approximately ten and seventy feet. The aquifer also flows in a southeasterly direction, at a rate of between one-and-a-half and five feet per day. The water in the aquifer passes under the land owned or leased by appellees after it has passed under American Salt's brine fields and plant.

Salt concentrations of over 30,000 parts per million have been recorded in water samples drawn from the aquifer. Concentrations of 250 parts per million are sufficient to render water unfit for domestic or irrigation use. As found by the district court, the salt present in the aquifer escaped from the property and control of American Salt. The majority of the salt escaped through subsurface leaks, while the remainder percolated downward from surface spills.

Due to insufficient rainfall, farmers in Rice County are unable to grow corn without irrigating their land. Appellees alleged that because of the salt pollution of the aquifer, they are unable to irrigate and therefore can grow only dryland crops such as wheat and milo, which do not produce the revenues generated by corn crops.

The district court, in commenting on the more than half-century of disputes between American Salt and area farmers, described the historical background of this case as "Dickensian" in nature. *Miller v. Cudahy Co.,* 656 F.Supp. 316, 319 (D.Kan.1987) (*Miller III*). Final resolution of this lawsuit itself required nearly a decade. On May 31, 1977, appellees filed their complaint seeking injunctive relief and actual and punitive damages. Following a protracted discovery period, the final pretrial order was filed on March 9, 1982.

The district court denied appellants' motion for summary judgment,[1] which was predicated on their contention that appellees' claims were barred by the statute of limitations. The court concluded that appellees' showing was sufficient to categorize the American Salt operation as a continuing, abatable nuisance causing temporary damages and giving rise to a continuing series of causes of action. *Miller I,* 567 F.Supp. at 906–08. The court also concluded that the two-year statute of limitations did operate to preclude appellees from recovering for injuries sustained more than two years prior to the filing of their complaint. *Id.* at 909. The court stated that appellees were entitled to attempt to prove and recover their damages accruing between a date two years before the complaint was filed (May 31, 1975) and the date of judgment. *Id.* at 909.

Following a bench trial, the court found appellants liable for temporary damages to annual crops and awarded appellees $3.06 million in actual damages for the period of

---

**1.** The court did enter summary judgment against several plaintiffs whose land was either completely outside the boundaries of the aquifer or had not yet been affected by the salt pollution of the aquifer. *Miller I,* 567 F.Supp. at 897–98.

1975 through 1983.[2] *Miller II*, 592 F.Supp. at 1005. The court arrived at the amount of lost crop profits by calculating the difference between the net value of corn crops and the net value of the wheat and milo crops which were actually grown. *Id.* at 990–92. The court also awarded $10 million in punitive damages; however, it retained jurisdiction over the award and held final judgment in abeyance, pending appellants' "good-faith efforts to define and remedy the pollution they have caused." *Id.* at 1007–08. Pursuant to Fed. R.Civ.P. 54(b), the court entered final judgment on the issues of liability and actual damages. *Id.* at 1008–09. Appellants filed a timely notice of appeal, but this court dismissed their appeal as premature. *Miller v. Cudahy Co.*, No. 85–1450, slip op. at 6 (10th Cir. Jan. 31, 1986).

Three years later, the district court rejected a court-ordered cleanup plan, because no feasible plan had been presented, and declined to remit any of the punitive damages award. *Miller III*, 656 F.Supp. at 356–57. The court also denied as untimely appellant General Host's motion to dismiss, in which General Host had argued that the court had incorrectly applied the doctrine of piercing the corporate veil in finding General Host liable for the salt pollution of the aquifer. *Id.* at 322–24. Finally, the court taxed as costs to appellants the expert witness fees of appellees' trial expert for his participation in the post-trial remedial action phase. *Id.* at 339.

## I.

■ Appellants first argue that appellees' claims are time-barred, the primary thrust of their argument being that the injuries suffered by appellees are permanent in nature and were ascertained long before the statute of limitations began to run. They additionally assert that they should not be equitably estopped from raising the statute of limitations defense.

The applicable Kansas statute of limitations, Kan.Stat.Ann. § 60–513 (1983), provides in pertinent part:

(a) The following actions shall be brought within two (2) years: (1) An action for trespass upon real property.

 • • • • •

(4) An action for injury to the rights of another, not arising on contract, and not herein enumerated.

The crucial question in regard to the applicability of the two-year statute of limitations is whether the injuries sustained by appellees are permanent or temporary in nature. Drawing a distinction between permanent and temporary damages resulting from a nuisance is at best problemmatical.[3] The district court, upon surveying Kansas nuisance law from 1876 to the present, noted that the relevant cases addressing the distinction between permanent and temporary injuries are somewhat unclear and inconsistent. *Miller I*, 567 F.Supp. at 899.

The Kansas Supreme Court likewise has recognized the rather confused state of the law concerning the distinction between permanent and temporary nuisances. *See, e.g., Gowing v. McCandless*, 219 Kan. 140, 547 P.2d 338, 342 (1976); *Henderson v. Talbott*, 175 Kan. 615, 266 P.2d 273, 278 (1954). The supreme court recently indicated that the distinction between temporary and permanent damages remains a viable concept, however, while emphasizing that "no hard and fast rule can be adopted as to when the damages are deemed permanent and when they are deemed tempo-

---

**2.** The district court also concluded that appellants were liable to several individual plaintiffs for the following actual damages: approximately $8,000 for brine trespasses; nominal damages of $1 for pipeline trespass; consequential damages of $7,000 for damage to three domestic water wells; and consequential damages of $42,500 for damage to a dairy operation. *Miller II*, 592 F.Supp. at 1005–06.

**3.** As described in one torts treatise, "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.'" W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Torts 616 (5th ed. 1984). In regard to the specific issue presented here, another treatise notes the general confusion surrounding the distinction the courts have drawn between permanent and temporary nuisances. F. Harper, F. James & O. Gray, The Law of Torts § 1.30 (2d ed. 1986).

rary." *Olson v. State Highway Comm'n of Kan.*, 235 Kan. 20, 679 P.2d 167, 172 (1984). Noting that some cases refer not only to the permanent or temporary nature of the damages, but also to the permanent or temporary nature of the causative factor, the court stressed that "[e]ach case must be considered in its own factual setting." *Id.*

In light of its examination of the pertinent Kansas nuisance cases, the district court was convinced "that the Kansas Supreme Court, if presented with [appellant's] statute of limitations argument, would find that argument unpersuasive." *Miller I,* 567 F.Supp. at 906. Our reading of those cases comports with the district court's, and we conclude that the salt pollution resulting from American Salt's operations constitutes a continuing nuisance causing temporary damages.

Under Kansas law, the plaintiff has the option of suing for either permanent or temporary damages.[4] *See Augustine v. Hinnen,* 201 Kan. 710, 443 P.2d 354, 355–56 (1968). If permanent damages are sought, an action claiming such damages must be brought within two years. *Gowing v. McCandless,* 547 P.2d at 343. "Permanent damages are given on the theory that the cause of injury is fixed and that the property will always remain subject to that injury." *McAlister v. Atlantic Richfield Co.,* 233 Kan. 252, 662 P.2d 1203, 1211 (1983). They "are damages for the entire injury done—past, present and prospective —and generally speaking [are] those which are practically irremediable." *Id.*

If the injury or wrong is classified as temporary, the limitation period starts to run only when the plaintiff's land or crops are actually harmed, and for purposes of the statute of limitations, each injury causes a new cause of action to accrue, at least until the injury becomes permanent. *Williams v. Amoco Production Co.,* 241 Kan. 102, 734 P.2d 1113, 1119 (1987); *Gowing v. McCandless,* 547 P.2d at 342; *see generally* F. Harper, F. James & O. Gray, The Law of Torts § 1.30 (2d ed. 1986). This rule is especially applicable if the situation involves elements of uncertainty, "such as the possibility or likelihood of the alteration or abatement of the causative condition." *Gowing v. McCandless,* 547 P.2d at 342. The rule is predicated upon the defendant's ability and duty to abate the existing conditions which constitute the nuisance. *Id.* at 343; *accord McAlister v. Atlantic Richfield Co.,* 662 P.2d at 1211 (stating that temporary damages "are awarded on the theory that cause of the injury may and will be terminated").

Appellants rely primarily on *McAlister v. Atlantic Richfield Co.* in arguing that the damages caused by their admitted pollution of the aquifer will last indefinitely (at least 200 years) and therefore are permanent for purposes of the statute of limitations.[5] In *McAlister,* the plaintiff sued for temporary damage to his water well caused by the defendant's oil fields. The plaintiff alleged "that not less than 150 nor more than 400

---

4. In support of their argument that the salt pollution constitutes a permanent nuisance, appellants contend that appellees' original complaint was pled in terms of permanent damages. That contention is without merit. The final pretrial order describes the contentions and issues in terms of continuing nuisance and trespass. Rec. vol. I, doc. 309 at 4; *see Miller I,* 567 F.Supp. at 907–08. Further, the Kansas Supreme Court has indicated that an allegation of permanent damages would include allegations of temporary damages. *Kiser v. Phillips Pipe Line Co.,* 141 Kan. 333, 41 P.2d 1010, 1011 (1935).

5. Appellants further rely on *Atkinson v. Herington Cattle Co.,* 200 Kan. 298, 436 P.2d 816 (1968), in which the plaintiff brought suit within two years of discovering nitrate pollution in a well which supplied water for his dairy farm.

The nitrates had emanated from the defendants' feedlot operation. The Kansas Supreme Court affirmed the trial court's conclusion that proof that damage to real property will remain "for an indefinite time" will sustain a judgment for permanent damages. *Id.* 436 P.2d at 820, 824.

*Atkinson* is distinguishable. The issue was framed in terms of sufficient evidence to sustain the trial court's award of actual damages, and did not involve any discussion of the elusive permanent-temporary distinction. Moreover, as discussed above, appellants' reliance on the allegedly permanent nature of the *injury* overlooks the nature of the causative factor, i.e., American Salt's operation, which must also be factored into the analysis of whether damages resulting from a nuisance are permanent or temporary.

years will pass before the well water will be once again fit for drinking." *McAlister v. Atlantic Richfield Co.,* 662 P.2d at 1212. Under the circumstances of that case, in which there was no indication that the pollution was abatable and the relevant defendants had discontinued oil well operations in the 1940's, the Kansas Supreme Court held that portion of the claim to be barred by the two-year statute of limitations because the injury was "fixed" and "the property will always remain subject to that injury." *Id.* at 1211–12.

Pointing to information generated during the post-trial remedial phase, which purportedly indicates that any cleanup of the aquifer will take as long as 200 years, appellants contend that *McAlister* is controlling in that the injuries to appellees' farms are fixed and cannot be remedied within a reasonable time.[6] Initially, we agree with appellees that appellants cannot rely on post-trial "evidence," in particular the data contained in their own reports, to bolster their argument on appeal that the injuries are permanent for purposes of the running of the statute of limitations. This court will consider only that evidence adduced at trial. It should be noted that appellants filed a motion for a new trial, based in part on their post-trial testing of the aquifer which purportedly indicated that any cleansing of the aquifer would take significantly longer than had been indicated previously. The district court denied the motion, *Miller III,* 656 F.Supp. at 334, and appellants do not appeal that ruling.

The trial evidence indicates that the damage to the aquifer is remediable if the salt pollution is abated. While it is true that no conclusive time frame for the cleansing of the aquifer has been established, it is apparent to this court that, contrary to appellants' contention, the cleanup process can be accelerated by intervention measures and can be achieved within a reasonable time. Further, appellants' argument focusing solely on the nature of the injuries resulting from the salt pollution of the aquifer disregards the fact that we must also look at the nature of the causative factor of the pollution.[7] *Olson v. State Highway Comm'n of Kan.,* 679 P.2d at 172. Appellants do not contend that there is no "possibility or likelihood" that the causative condition, namely American Salt's mining operations, can be altered or abated. *Gowing v. McCandless,* 547 P.2d at 342. The record indicates that the cause of the injuries can be terminated, and indeed appellants state that they have already undertaken measures to do so. *See* Brief for Defendants–Appellants at 35. Nor do appellants argue that they have no duty to abate the existing conditions which constitute the nuisance. *See Gowing v. McCandless,* 547 P.2d at 343; *McAlister v. Atlantic Richfield Co.,* 662 P.2d at 1211. The conclusion that the damages are temporary is bolstered by the evidence that the

---

6. Appellants also cite to the district court's statement, made upon concluding that a court-ordered cleanup plan was not feasible, that "the pollution is still not remediable *within a reasonable time." Miller III,* 656 F.Supp. at 357 (emphasis in original). Taken in context, the court's statement was made in reference to the untenable nature of a court-supervised remedial plan, *see id.* at 351–57, and in any event is certainly not conclusive as a refutation of the *trial* evidence regarding the time frame for cleansing the salt pollution from the aquifer.

7. In pointing out the inconsistent use of the terms "temporary" and "permanent" in the Kansas cases, the district court noted

that, when realty is damaged by pollution, the terms 'temporary' and 'permanent' can be applied to three quite distinct facets of the situation. First, the *pollution itself,* or the causal chemistry of the injury to the land, may be either temporary or permanent. Second, the *damage or loss* caused by the injury may be temporary or permanent. Last, the *source or origin of the pollution,* be it a sewage plant, an oil well, or a salt mine, may be temporary or permanent. The possibilities for inconsistencies are, of course, multiplied when different labels are applied to these facets, such as, for example, calling the source of the pollution a nuisance and then characterizing the nuisance as temporary or permanent.

*Miller I,* 567 F.Supp. at 899–900 (emphasis in original). The district court's analysis is helpful to our determination of the legal nature of the nuisance and serves to reinforce our interpretation of the Kansas nuisance cases, namely that appellants' argument is deficient by virtue of focusing solely on the nature of the injuries resulting from the salt pollution of the aquifer.

salt pollution actually continued during the course of this litigation, further indicating the existence of a continuing nuisance. *See Miller II*, 592 F.Supp. at 990.

The damage to the aquifer is remediable and the cause of the damage is abatable. Upon considering all the facts and circumstances, including the nature of the pollution and the nature of the causative factor, as well as the continuing pollution of the aquifer, we conclude, as did the district court, that American Salt's operation constitutes a continuing nuisance causing temporary damages.

Having rejected appellants' assertion that the damages resulting from their pollution of the aquifer are permanent for statute of limitations purposes, we also reject their claim that *all* of appellees' claims are time-barred. The fact that salt pollution has existed in the aquifer for many years does not negate the district court's limitation of appellees' recovery to temporary damages. By limiting their potential recovery to those damages incurred not more than two years prior to the filing of their complaint, the court implicitly determined that the two-year statute of limitations precluded any claims for permanent damages.

Finally, appellants contend that they should not be equitably estopped from asserting that appellees' claims are time-barred. The district court concluded that the statute of limitations should be equitably tolled and that the appellants should be equitably estopped from relying on the statute of limitations defense.[8] *Miller II*, 592 F.Supp. at 1008. Our resolution of the statute of limitations question obviates the need to address this issue.

## II.

Arguing that the district court's method of calculating actual damages was erroneous as a matter of law, appellants assert that the amount of temporary damages awarded cannot exceed the potential recovery for permanent damages. They alternatively contend that, assuming the propriety of an award of temporary damages, the proper measure of such damages is the reduced rental value of appellees' land.

The district court's calculation of the amount of actual damages is reviewed under the clearly erroneous standard. Fed.R. Civ.P. 52(a). We are not constrained by the clearly erroneous standard, however, if the court's computation of damages is predicated upon a misconception of the governing rule of law. *Chaparral Resources, Inc. v. Monsanto Co.*, 849 F.2d 1286, 1289 (10th Cir.1988) (addressing proper legal standard for damages resulting from the wrongful repudiation of a contract).

The temporary-permanent distinction which is determinative in regard to the running of the statute of limitations is also relevant to the question of the proper measure of damages resulting from an actionable nuisance. *See McAlister v. Atlantic Richfield Co.*, 662 P.2d at 1211; F. Harper, F. James & O. Gray, The Law of Torts at § 1.30. In Kansas, the measure of damages for permanent injury to real property is the difference in the fair market value of the land before and after the injury. *Williams v. Amoco Production Co.*, 734 P.2d at 1120; *Kiser v. Phillips Pipe Line Co.*, 141 Kan. 333, 41 P.2d 1010, 1011–12 (1935). Diminished fair market value is not used as the measure of recovery, however, if an injury to real property is temporary in nature. Temporary damages represent the reasonable cost of repairing the property, "which may include the value of the use thereof during the period covered by the suit, or it may be the diminution in the rental value of the property, together with such special damages to crops, improve-

---

8. The court's Conclusion of Law No. 38 states:
 The Court concludes that, in the event the statute of limitations is deemed to apply to the claims of the plaintiffs in this case in such a way as to completely bar those claims, the facts and circumstances shown by the evidence clearly demonstrate that the statute of

limitations should be equitably tolled and that the defendants should be equitably estopped from relying on the statute of limitations defense. *See, e.g., Newton v. Hornblower, Inc.*, 224 Kan. 506, 516, 582 P.2d 1136 (1978). *Miller II*, 592 F.Supp. at 1008.

ments, etc." *Kiser v. Phillips Pipe Line Co.*, 41 P.2d at 1012; *accord Alexander v. Arkansas City*, 193 Kan. 575, 396 P.2d 311, 315 (1964).

Appellants' assertion that temporary damages may not exceed the value of the property injured, or essentially that there must be a "cap" on an award of temporary damages, is unsupported by pertinent Kansas authority. Their alternative contention, that the sole measure of such damages is reduced rental value, is likewise unsupported. While reduced rental value of the property injured is indeed one measure of temporary damages, the value of the *use* of the property is also a proper measure of damages. The Kansas Supreme Court has treated the value of the use of property and the diminution of rental value as separate and distinct bases for awarding temporary damages. *See Alexander v. Arkansas City*, 396 P.2d at 315; *Kiser v. Phillips Pipeline Co.*, 41 P.2d at 1012; *see also* D. Dobbs, Remedies § 5.3 (1973) (noting difference between rental value and use value).

■ The district court found that because irrigated corn crops would be more profitable than the dryland crops appellees were forced to grow because of the salt pollution of the aquifer, appellees "have been damaged by the pollution to the extent of these lost crop profits." *Miller II*, 592 F.Supp. at 991. In so finding, the court applied the proper legal standard under Kansas law for measuring temporary damages. *See Kiser v. Phillips Pipe Line Co.*, 41 P.2d at 1012. The court's calculation of actual damages, made upon consideration of the similar formulas presented by the various expert witnesses, was based upon the difference between the net value of the lost corn production and the net value of the wheat and milo crops actually grown. *Miller II*, 592 F.Supp. at 991–92. That calculation is supported by the evidence and is not clearly erroneous.

## III.

Appellants next contend that the $10 million punitive damages award is not supported by the evidence. They further contend that the district court abused its discretion by refusing to eliminate or substantially reduce the "contingent" award at the close of the post-trial remedial phase and that the Kansas law of punitive damages is unconstitutional as applied to the facts of this case.

### A.

■ The issue of whether there is sufficient evidence to justify an award of punitive damages is a question of law. *Alley v. Gubser Development Co.*, 785 F.2d 849, 855 (10th Cir.), *cert. denied*, 479 U.S. 961, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986) (applying Colorado exemplary damages statute). In a diversity case, the circumstances under which punitive damages are available are governed by state law, as are the substantive elements upon which such an award may be based. *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988) (addressing remittitur of punitive damages award). "Thus, an assessment of the propriety of awarding punitive damages and the sufficiency of the evidence to support the award must necessarily be made by reference to the factors that the state has deemed relevant in determining whether punitive damages are appropriate." *Id.*

Under Kansas law, punitive damages may be imposed for a willful and wanton invasion of an injured party's rights, the purpose being to restrain and deter others from committing like wrongs. *Id.* at 1446; *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, 1061 *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984). "Wantonness is characterized by a realization of the imminence of damage to others and a restraint from doing what is necessary to prevent the damage because of indifference as to whether it occurs." [9] *Boehm v. Fox*, 473

---

9. In *Newman v. Nelson*, 350 F.2d 602, 604 (10th Cir.1965), a diversity case in which the jury

awarded actual and punitive damages for the pollution of the plaintiff's stock pond by crude oil

F.2d 445, 447 (10th Cir.1973). A punitive damages award "must be viewed in light of the actual damages sustained, the actual damage award, the circumstances of the case, the evidence presented, the relative positions of the plaintiff and the defendant, and the defendant's financial worth." *Wooderson v. Ortho Pharmaceutical Corp.*, 681 P.2d at 1064.

In the instant case, the award of punitive damages is clearly supported by the evidence, in particular the testimony of three former American Salt employees. It is readily apparent that appellants created the nuisance and "persistently maintain[ed] it with a reckless disregard for the rights of others." *Newman v. Nelson*, 350 F.2d 602, 604–05 (10th Cir.1965). Appellants' conduct was deliberate, with full knowledge of the consequences and with a marked indifference thereto.

### B.

 Contending that the district court abused its discretion by refusing to remit the punitive damages award at the close of the post-trial remedial phase, appellants characterize the court's award as "contingent." That characterization is premised on the court's retention of jurisdiction over the award "to evaluate a potential cleanup to be implemented in lieu of some or all of the punitive damages award." *Miller III*,

656 F.Supp. at 324. The court stated that, because appellants' post-trial conduct would be "extremely relevant" to their "state of mind" at the time of the occurrences, punitive damages would be eliminated or substantially reduced if the defendants undertook a "conscientious, good-faith, and realistic effort to address and remedy, within a reasonable time, the pollution presently existing in the aquifer." *Miller II*, 592 F.Supp. at 1007–08. Appellants now argue that their post-trial conduct "is further proof of their good intent" and that the court abused its discretion by belatedly imposing new conditions for establishing good intent.

Federal law governs the decision whether a remittitur should be granted, the decision being tested on appellate review by an abuse of discretion standard. *K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1162 (10th Cir.1985). In *O'Gilvie*, which was handed down some three months after the district court's final opinion, this court held that a trial court is without authority under either state or federal law to reduce a punitive damages award on the basis of post-trial conduct.[10] *O'Gilvie v. International Playtex, Inc.*, 821 F.2d at 1449–50. Thus the district court would have been without discretion to reduce or eliminate the punitive damages on the basis of events occurring after the trial.[11] *See id.* at 1449.

escaping from the defendant's oil lease operations, this court noted that there was "no reason to doubt that Kansas courts would embrace the nuisance theory for punitive damages." As explained by Chief Judge Murrah, "to be liable for actual damages one need only create or commit a nuisance, *but to be punished for it he must create and persistently maintain it with a reckless disregard for the rights of others." Id:* at 604–05 (emphasis added). Based on that legal premise, the panel concluded that "the proof falls far short of showing an indifferent maintenance of a nuisance" and reversed the judgment as to punitive damages. *Id.* at 605–06.

**10.** In *O'Gilvie*, the plaintiff alleged that his wife's use of the defendant's super-absorbent tampons caused her death from toxic shock syndrome. The jury awarded the plaintiff $10 million in punitive damages. Upon the defendant's post-trial representation that it was discontinuing the sale of some of its products, instituting a program of alerting the public to the dangers of toxic shock syndrome and modifying

its product warning, the district court ordered the punitive damage award reduced to $1,350,-000. *O'Gilvie v. International Playtex, Inc.*, 821 F.2d at 1440–41. After reviewing the bases for remitting a punitive damage award, this court concluded

that because the post-trial conduct upon which the trial court relied in ordering remittitur in this case had no relevance to the injurious conduct underlying the claim for punitive damages, the court was without authority under either state or federal law to reduce the award on that basis. In addition, we are compelled to point out that the court's order subverts the goals of punishment and deterrence that underlie the assessment of punitive damages in Kansas.

*Id.* at 1450.

**11.** The district court apparently recognized that limitation on its power to remit the punitive damages award. As stated by the court, "[a]n elementary aspect of punitive damages seems to have been forgotten in this case: they are

While the district court did not have the benefit of this court's opinion in *O'Gilvie* upon entering final judgment on the punitive damages award, any reduction, or elimination, of the award would have been highly questionable, given our perception that there is no relationship between appellants' post-trial conduct and their state of mind at the time of the tortious acts. Even assuming that appellants' post-trial conduct was relevant, and that the district court had the power to remit the punitive damages award on the basis of that conduct, we would be unable to find the court would have abused its discretion in not doing so. *See Miller III,* 656 F.Supp. at 354–356 (discussing appellants' lack of good faith in the post-trial remedial phase).

Regarding the court's retention of jurisdiction over the punitive damages award, this case points up some of the problems inherent in trial courts using their equitable jurisdiction to attempt to oversee solutions to problems such as the cleanup of the aquifer. The court's attempt to fashion an equitable remedy which would result in the cleansing of the aquifer was well-intentioned, and we have no reason to question the court's statements that "the actions proposed went to the nature of relief [appellees] were seeking, and were consistent with the relief requested" and that the court was attempting "to fashion a remedy which truly rectified the wrong, not merely compensated for it." *Miller III,* 656 F.Supp. at 351. However, during the post-trial phase the parties addressed other matters only tangentially related to the cleanup plans, *id.,* and as the court candidly admitted, *see id.* at 342, 351–57, a court-supervised remedial program was simply not feasible.

### C.

Finally, appellants assert that the Kansas law of punitive damages is unconstitutional because it places no limits on the amount of such awards. They argue that because punitive damage awards are essentially penal in nature, they mandate the procedural protections afforded by the eighth and fourteenth amendments to the United States Constitution.

Appellants have cited no persuasive federal constitutional authority to support their argument. The Kansas appellate courts have addressed similar arguments in varying contexts and have concluded that the imposition of punitive damages under Kansas law neither demands the same safeguards afforded in criminal prosecutions nor violates the due process clause. *See, e.g., Tetuan v. A.H. Robins Co.,* 241 Kan. 441, 738 P.2d 1210, 1245–46 (1987); *McDermott v. Kansas Pub. Serv. Co.,* 238 Kan. 462, 712 P.2d 1199, 1203 (1986); *Unified School Dist. No. 490 v. Celotex Corp.,* 6 Kan.App.2d 346, 629 P.2d 196, 206 (1981).

### IV.

■ Appellants next argue that the district court erred in imposing liability on General Host, absent a finding of piercing the corporate.veil. The crux of its argument is that the record is devoid of evidence sufficient to conclude that Cudahy is General Host's *alter ego.*

As discussed above, appellant General Host filed a motion to dismiss several years after the completion of the trial, arguing that the district court applied the wrong legal analysis in considering General Host's liability. The court denied the motion as untimely pled. *Miller III,* 656 F.Supp. at 324. Countering appellees' assertion that its piercing the corporate veil argument is not properly before this court, General Host contends that it preserved the issue by moving for a directed verdict at the close of appellees' case and by later submitting requested findings of fact and conclusions of law on that point. Brief for Defendants–Appellants (No. 87–1502) at 52 n. 56. It further points to appellants' Fed.R. Civ.P. 59 motion in which it argued that it could not be held liable under any theory of liability. *Id.* We agree with appellees that this issue is not properly before us, and decline to address the merits of an issue upon which the district court did not rule

awarded on account of *past* behavior." *Miller III,* 656 F.Supp. at 354 (emphasis in original).

and for which appellees were not compelled to produce any refuting evidence.

General Host's oral motion for a directed verdict simply stated that appellants would reserve argument and comment on appellees' evidence at the close of the case. Rec. vol. 45 at 2602–03. In its motion to amend findings and judgment or, in the alternative, for a new trial, General Host argued on several grounds that it could not be held liable for damages but did not argue that it should be dismissed as a defendant.[12] Rec. vol. 2, doc. 462 at 28–30. On appeal, General Host does not assign error to the denial of its motion to dismiss, but rather argues that the district court applied the wrong legal theory in imposing ·liability. It has not specified the manner in which this issue was preserved for appeal.

In considering the procedural basis on which General Host sought dismissal, the district court determined that the motion was based on Fed.R.Civ.P. 12(b)(6). *Miller III*, 656 F.Supp. at 322–23. The court noted that while General Host alluded to the theory in its answer, it did not move for dismissal at that time, did not move for dismissal on such grounds in any motion for judgment on the pleadings under Fed. R.Civ.P. 12(h)(2), and did not move for dismissal at trial. *Id.* at 323. The court concluded that a mere recital of the defense of failure to state a claim upon which relief can be granted in the answer was insufficient to preserve the issue for belated consideration. *Id.* at 324.

Appellant General Host delayed far too long in seeking dismissal claiming the *alter ego* theory did not apply. Except in cases involving subject matter jurisdiction, an appellate court is most reluctant to consider grounds raised for reversal not adequately developed by a party before or at trial. To be sure, there are exceptions, but adherence to this principle encourages a single

and complete presentation of issues prior to and at trial. *National Advertising Co. v. City of Rolling Meadows*, 789 F.2d 571, 574 (7th Cir.1986). It also encourages sufficient factual development of those issues presented and respects tactical decisions made by both sides. A district court is not obligated to develop offhand references to legal terms into workable theories. *National Metalcrafters v. McNeil*, 784 F.2d 817, 825 (7th Cir.1986).

Nor must an appellate court perform this task. This case does not present extraordinary circumstances which would warrant consideration of the merits of the motion to dismiss. To the contrary, the *alter ego* issue is largely a factual one and the record is not fully developed. Moreover, the trial court's decision to hold General Host liable based on its domination of Cudahy and American Salt, *see Miller II*, 592 F.Supp. at 997–98, is supportable on factual and legal grounds. *See* H. Henn & R. Alexander, Laws of Corporations and Other Business Enterprises § 148 at 354–56 (1983) ("Where one corporation is under the domination of another, the separate corporate entities or personalities might be recognized, treating the latter as principal and the former as agent, thus making the acts of the latter in effect the acts of the former."). For these reasons, we decline to address the substance of General Host's untimely motion to dismiss.

## V.

The final issue raised by appellants is whether the district court erred in awarding expert witness fees in excess of the statutory limit. They contest the court's decision to tax as costs nearly $40,000 in fees and expenses incurred by appellees' trial expert during the post-trial remedial investigation.

---

**12.** In its motion, General Host stated that for the district court to hold it "liable for damages, which were suffered by most of the plaintiffs as a result of occurrences many years prior to 1973, is without precedent." Rec. vol. 2, doc. 462 at 28. The motion further states that "[i]t would be one thing to require General Host to pay for damages caused by American Salt since

1973; *it is quite another to use the events transpiring since May 31, 1975, to make General Host liable for all damages suffered by plaintiffs, regardless of when they occurred." Id.* (emphasis added). That statement undercuts General Host's argument on appeal that no liability whatsoever can be imposed on it on the basis of a parent-subsidiary relationship.

■ Absent express statutory or contractual authorization for the taxation as costs the fees of a party's expert witness, federal courts are bound by the limitations set out in 28 U.S.C. §§ 1821 and 1920. *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* — U.S. ——, 107 S.Ct. 2494, 2498–99, 96 L.Ed.2d 385 (1987); *Chaparral Resources, Inc. v. Monsanto Co.,* 849 F.2d at 1292. A party's expert witness fees are recoverable only up to the $30–per-day statutory limit applicable to any witness. *Chaparral Resources, Inc. v. Monsanto Co.,* 849 F.2d at 1292; *Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1550 (10th Cir.1987).

The district court found that certain fees and expenses of Dr. Dan Raviv, a geohydrologist and appellees' trial expert, were properly taxable to appellants. *Miller III,* 656 F.Supp. at 339. These fees and expenses were incurred in connection with the post-trial remedial action phase of the case. *Id.* Initially citing to a number of pre-*Crawford* cases which indicated that such an award would be a justifiable exercise of its equitable discretion, *id.* at 337–39, the court found that such a basis for the taxation of Dr. Raviv's fees was unnecessary, *id.* at 339. Rather, the court stated that because its initial opinion *required* appellants to consult an expert designated by appellees during the remedial phase, "[i]t should come as no surprise now that [appellants] are responsible to pay for the expert consultations which they received." *Id.*

As we interpret the district court's reasoning, Dr. Raviv's fees were assessed as costs because the court had ordered the development of a remedial plan, thus making Dr. Raviv a "quasi" court-appointed expert. Indeed, the court did order appellants to consult with an expert chosen by appellees in formulating a remedial action plan. *Miller II,* 592 F.Supp. at 1007, 1009. While the court's logic is easily followed, the record indicates that the court refused to appoint an expert witness to assist in the formulation of a remedial plan.[13] *See, e.g.,* Rec. vol. 3, doc. 624 at 1. Although the court could have properly taxed Dr. Raviv's fees had he been appointed by the court, *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 107 S.Ct. at 2498, Dr. Raviv was not so appointed. While we are cognizant of the unusual circumstances presented by the court's retention of jurisdiction pending the presentation of a viable cleanup plan, this case does not come within any of the exceptions to the established rule that expert witness fees are assessable only up to the statutory limit. Nor could the court have assessed the fees as an exercise of its equitable discretion under Fed.R.Civ.P. 54(d). That discretion is constrained by the fee statutes. *Id.* at 2499; *Chaparral Resources, Inc. v. Monsanto Co.,* 849 F.2d at 1292. We conclude that the district court erred in awarding the post-trial expert witness fees of Dr. Raviv.

We affirm the district court's judgment in its entirety with the exception of the assessment of the post-trial expert witness fees of Dr. Raviv. We reverse the award of the expert witness fees and remand for recalculation of costs in compliance with 28 U.S.C. §§ 1821 and 1920.

13. In *Miller III,* the district court explained that in denying appellees' motion for a court-appointed expert, what it declined to do was to select an additional independent expert. *Miller III,* 656 F.Supp. at 338. The court stated that

[t]he expert designated by the plaintiffs [appellees], Dr. Raviv, was involved in the remedial action phase by specific order of this Court, and his involvement was not affected by the Court's later order. In this context, it is apparent that Dr. Raviv was not only a court appointed expert, but he was no longer 'plaintiffs' expert.' Defendants were required by this Court to work with him in developing their plan.

*Id.* The court then concluded that Dr. Raviv was in actuality *appellant's* expert. "Therefore, as Dr. Raviv was in reality 'defendants' expert' for the purpose of the remedial action phase of this case—that is, he was an expert defendants were required to and did consult in their plan development—it is not only equitable to require them to pay his fees, but it is to be expected." *Id.* at 338–39.

We cannot agree that Dr. Raviv was a court-appointed expert. As discussed above, he was merely working on the court-ordered remedial plan. If Dr. Raviv was appellants' expert, then we have the rather anomalous situation of the *court ordering a party to pay its own expert* witness fees. We agree with appellants that such is a mischaracterization based on Dr. Raviv's use by the appellees. *See* Brief for Defendants–Appellants (No. 87–2283) at 15–20.

AFFIRMED IN PART and REVERSED IN PART and REMANDED.